*Court of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*





# OPINION

No. 04-10-00602-CV

**MARIN REAL ESTATE PARTNERS, L.P.**, Derra Edwards, Hugh L. Lam, James P. Shee, Cheng-Lein C. Shee, Ricardo Velasquez, Gary M. Maganaris, Robin K. Pang-Maganaris, Dennis E. Gauthier, Cecilia G. Gauthier, Leal Urgin, Dresden & Goldberg Invesco, LLC, Maganaris Family Trust, and Boerne Trust's, G2 Assets, LLC,
Appellants

v.

John E. **VOGT** and Nelda L. Vogt,
Appellees

From the 216th Judicial District Court, Kendall County, Texas
Trial Court No. 06-150
Honorable N. Keith Williams, Judge Presiding

Opinion by:   Marialyn Barnard, Justice

Sitting:     Catherine Stone, Chief Justice
             Phylis J. Speedlin, Justice
             Marialyn Barnard, Justice

Delivered and Filed:  November 23, 2011

AFFIRMED

This is an appeal from a judgment in favor of appellees John E. Vogt and Nelda T. Vogt on their claims for injunctive relief and damages for easement encroachment, diversion of surface water, and malicious prosecution. On appeal, appellants Marin Real Estate Partners, L.P., Derra Edwards, High L. Lam, James P. Shee, Cheng-Lein C. Shee, Ricardo Velasquez, Gary M. Maganaris, Robin K. Pan-Maganaris, Dennis E. Gauthier, Cecilia G. Gauthier, Leal

Urgin, Dresden & Goldberg Invesco, LLC, Maganaris Family Trust, and Boerne Trust's, G2 Assets, LLC (collectively "Marin") raise nine issues challenging the judgment. The issues include challenges to: the sufficiency of the evidence, the award of injunctive relief, the admission of expert testimony, and the viability of judgment following a default judgment against one of the original defendants. We affirm the trial court's judgment.

## BACKGROUND

In the early 1950s, the Vogts purchased a nineteen-acre tract of land in Kendall County, Texas. The couple has lived on this property since it was purchased. In 1975, the Vogts purchased an adjacent 0.911-acre tract ("the one-acre tract"). The Vogts' deed to the one-acre tract expressly granted the Vogts a twenty-foot easement for ingress and egress from the highway to the one-acre tract. This easement was the only way for the Vogts to access the one-acre tract without trespassing or driving through a field and across a drainage ditch on the nineteen-acre tract.

In 2005, a real estate developer, Trada Partners VI, LP, purchased the property adjoining the Vogts' one-acre tract. The property purchased by Trada Partners adjoined the Vogts' twenty-foot easement. The City of Boerne notified the Vogts about a public meeting scheduled to discuss Trada Partners's rezoning request with regard to the property. Trada Partners wanted to build a development on the property, which was to be called The Village at Stone Creek. The development would consist of thirty-two four-plex apartment buildings. At the time of the purchase, the adjoining property contained a few buildings and a baseball field.

According to the Vogts, at the public meeting they met John Sieckert who was either the president or vice president of Trada Partners. Mr. Vogt testified he welcomed Sieckert to the neighborhood and advised him about the twenty-foot easement. According to Marin, Mr. Vogt

agreed to swap his easement for another easement to be provided as part of the new development. The new easement would be paved and gated. Marin contends Trada Partners's development moved forward in reliance upon Mr. Vogt's representation that he would "swap easement for easement," and it was only after Trada Partners had expended millions of dollars on the development that the Vogts filed suit.[1] Mr. Vogt denied he ever agreed to swap his current easement for a new easement, admitting only that on a single occasion he "casually mentioned to someone with the City of Boerne that he might be willing to exchange easements" if it would enable to him to access his one-acre tract. Mr. Vogt denied ever speaking to anyone with Trada Partners or Marin about this, and claimed no one from Trada Partners or Marin ever even offered to exchange easements with him or provide the Vogts with a new easement. It is undisputed there was no written agreement concerning an exchange of easements.

In any event, Mr. Vogt ultimately became concerned when he saw dirt and debris being piled onto his easement and tried to contact someone at Trada Partners. Mr. Vogt testified that in January 2006, he met with Sieckert and showed him how construction crews were piling dirt on the easement. According to Mr. Vogt, Sieckert stated, "If you think . . . we're going to change our plans because you say that's your easement . . . you're greatly mistaken." Despite Sieckert's alleged statement, the subdivision plat for the development expressly recognized the Vogts' "20' ingress and egress easement."

There was testimony that during construction, Trada Partners built pads, hauled in dirt, and raised the level of the property, including the easement, by as much as two-and-a-half feet. After Marin acquired part of the development, it continued the construction, encroaching on the easement and raising the level of the property. In February of 2006, Mr. Vogt sent a letter to

---

[1] Initially, the Vogts sued only Trada Partners. However, after construction of the development was complete, the Vogts named subsequent purchasers of property within the development as defendants.

Trada Partners that provided the developer with deed record references for the easement. Mr. Vogt testified he sent the letter because Trada Partners and Marin had erected a fence that blocked ingress and egress by way of the easement, built a rock and dirt wall on the easement, and dug a large ditch that prohibited passage. In response, Mr. Vogt received a letter from counsel for Trada Partners advising Mr. Vogt that Trada Partners had provided him with a "private gate" for access, but the easement had been terminated by eminent domain, had been unusable for years, and had been abandoned by non-use. According to Mr. Vogt, none of these statements was true, and we have found nothing in the record to support any of Trada Partners's assertions. Trada Partners's attorney concluded the letter by directing Mr. Vogt to "cease and desist" from attempts to use the easement–despite the fact the Vogts owned the easement by recorded deed.

After receiving the letter, Mr. Vogt hired an attorney, who wrote a letter to Trada Partners's attorney advising him the Vogts had a valid, recorded easement memorialized in the plats Trada Partners filed with the City of Boerne. He further advised Trada Partners's attorney the easement never terminated and had been in use by the Vogts until that use was barred by Trada Partners's actions. The letter demanded the easement be returned to its original condition. Evidence in the record shows Trada Partners did not restore the easement, but continued encroaching on and blocking the easement. At this point, the Vogts filed suit against Trada Partners. Marin and the other buyers were later added as defendants in the suit after they acquired portions of the development.

In the suit, the Vogts alleged the development encroached upon their easement, rendering it unusable. They further asserted the alterations, specifically increases in elevation, caused the diversion of the natural flow of surface water onto the easement and the Vogts' property, both

nineteen and one-acre tracts, resulting in flooding. The Vogts sought temporary and permanent injunctive relief, requiring the removal of any structures interfering with the easement, or damages for the loss of use of the easement and for damages due to surface water diversion.

Before trial, the trial court granted a temporary injunction in favor of the Vogts. *Trada Partners VI, LP v. Vogt*, No. 04-06-00723-CV, 2007 WL 163181, at *1 (Tex. App.—San Antonio Jan. 24, 2007, no pet.). The temporary injunction enjoined Trada Partners and Marin from interfering with the Vogts' use of the easement. *Id.* Trada Partners and Marin appealed the granting of the temporary injunction, and this court reversed, holding the Vogts had failed to "establish a sufficient probability of irreparable injury in the absence of a temporary injunction" because Mr. Vogt admitted the obstruction of the easement did not completely deprive the Vogts of access to the one-acre parcel; they could access the one-acre parcel through their other tract of land, which was contiguous to the one-acre tract. *Id.* at *1-*2. Because the Vogts would only suffer inconvenience if the injunction was lifted, they did not establish a sufficient probability of irreparable injury, an element that must be established to obtain a temporary injunction. *Id.* at *2.

Trada Partners and Marin answered the suit. Marin asserted a general denial and the affirmative defenses of estoppel, consent, fraud, and failure to mitigate. Marin later asserted a counterclaim seeking declaratory relief, specific performance, a finding of promissory estoppel, injunctive relief and damages based on the Vogts' alleged negligent misrepresentations, fraud, breach of contract, and trespass.

After suit was filed, the Vogts and Trada Partners entered into a Rule 11 agreement that provided: (1) the Vogts owned the easement, which was recorded in the deed records; (2) Trada Partners would not challenge the existence of continuing validity of the easement nor assert it

has been extinguished in any manner; and (3) the Vogts were entitled to "repair and maintain the Easement at their discretion" as long as they did not "unduly interfere with the servient estate," i.e., the development. When the easement became impassable, the Vogts' counsel advised counsel for Trada Partners by letter that if the easement were not restored to allow ingress and egress, the Vogts would exercise their rights under the Rule 11 agreement to maintain the easement themselves. When no action was taken, the Vogts hired a contractor to return the easement to its original condition, and the Vogts' counsel notified Trada Partners's attorney, who now represented Marin as well, of their intentions. In response, Trada Partners's attorney asked for the name of the contractor , claiming it was to coordinate activities. The Vogts' attorney disclosed the name of the contractor. Thereafter, someone from Trada Partners contacted the contractor and threatened him with "immediate legal action" if during the work on the easement he impeded the construction process or trespassed on property outside the easement. The contractor was also advised that if he worked on the easement, he needed to contact counsel for Trada Partners and Marin because the attorney would need to "depose [him] regarding [the] exact and complete scope of work" he intended to perform for the Vogts. The contractor, fearing involvement in the pending legal proceedings, refused to do the work for the Vogts, as did any other contractor in the area.

The Vogts then attempted to do the work themselves, which ultimately resulted in a report of criminal mischief and criminal trespass by someone from Trada Partners to the Boerne Police Department. Later, in 2008, Mr. Vogt was arrested after there was a second report from Susan Rogers, the manager of the apartments on the development, and a Trada Partners construction superintendent, that Mr. Vogt had damaged fencing and marked encroachments on the easement with orange spray paint. Sieckert was contacted during the police investigation and

advised the investigator that Mr. Vogt had damaged the property once before, and suspected he was responsible for this second round of "criminal mischief." The Boerne investigator also had contact with the attorney for Trada Partners and Marin, who advised him "Vogt had no need to use Trada's property since Vogt could access all of his property through his own property . . . [and] Trada has also provided a paved route through the property and a private gate for Vogt's property, but Vogt does not acknowledge it." The attorney did not advise the investigator about the Rule 11 agreement that allowed the Vogts to remove encroachments on the easement if Trada Partners and Marin refused. It was only after Mr. Vogt and his son showed the investigator the Rule 11 agreement and asked the attorney about it that the attorney acknowledged its existence. However, counsel for Trada Partners and Marin told the investigator this court's judgment in the temporary injunction action "overturned" the Rule 11 agreement and gave Trada Partners and Marin the right to build on the easement. The attorney told the investigator, based on this court's opinion, Trada Partners and Marin could block the entire easement if they so chose. The investigator called Sieckert again and Sieckert told him Rogers was his agent and would provide an affidavit on his behalf, which she did. Based on information provided to the Boerne Police Department by Trada Partners and Marin, Mr. Vogt was arrested for felony criminal mischief. Trada Partners and Marin allegedly reported that Mr. Vogt had moved dirt and damaged fencing, but eventually claimed he had caused some major structural damage costing thousands of dollars to repair. Although Mr. Vogt was ultimately "no-billed" by the grand jury, he was arrested, fingerprinted, and had his mug shot taken. Mr. Vogt testified that as a former Chief Deputy Sheriff and constable, he was extremely embarrassed by the arrest, especially after his mug shot was broadcast on television and counsel for Trada Partners and Marin talked about the case on

the news of a San Antonio television station.  This incident resulted in the Vogts asserting a claim for malicious prosecution.

When the case was called for trial on May 5, 2009, Trada Partners, which the trial court found received notice of the trial setting, failed to appear.  Accordingly, on October 12, 2009, the trial court entered a default judgment against Trada Partners.  The damages awarded to the Vogts against Trada Partners in the default judgment mirrored the damages ultimately found by the jury at trial.

A jury trial was held between the Vogts and the remaining defendants.  After all the evidence was heard, the jury was asked, generally, whether:

- improvements on the development encroached on the Vogts' easement, and if so, what sum of money would fairly and reasonably compensate the Vogts for loss of use of the easement from the time of the first encroachment to the present;

- the development resulted in a diversion of surface water onto the Vogts' one-acre tract, whether damages from the diversion were permanent or temporary, and if there was a diversion caused by the development, what sum of money would fairly and reasonably compensate the Vogts for loss of use of the one-acre tract and the difference in market value of the one-acre tract after the water diversion;

- the diversion of surface water caused damage to the Vogts' nineteen-acre tract, whether such damage was permanent or temporary, and if there was a diversion, what sum of money would fairly and reasonably compensate the Vogts for loss of use of the nineteen-acre tract and the difference in market value of the nineteen-acre tract after the water diversion;

- the act of diverting the surface water onto the Vogts' nineteen-acre tract was done with malice, and if so, what sum of damages should be awarded as exemplary damages for the malicious act; and

- Marin maliciously prosecuted Mr. Vogt, and if so, what sum of money would fairly and reasonably compensate him for his injuries.

The jury answered "yes" to all the liability questions and, where appropriate, found the property damage permanent.  The jury awarded the Vogts a total of $1,691,372 for their claims of encroachment, surface water diversion, and malicious prosecution.  The trial court thereafter

entered a judgment based on the jury's verdict, awarding the Vogts $1,691,372 in damages. The trial court also awarded the Vogts' $50,732.51 in attorney's fees and contingent appellate attorney's fees.[2] In addition to the compensatory relief, the trial court also awarded the Vogts' injunctive relief, requiring all encroachments be removed from the Vogts' easement.

Marin filed for judgment notwithstanding the verdict and a motion for new trial; both were denied. Thereafter, Marin perfected this appeal.

## ANALYSIS

On appeal, Marin raises nine issues, contending:

- the evidence is legally and factually insufficient to support the award of injunctive relief;

- the trial court erred in denying the motions for judgment notwithstanding the verdict and for new trial because the verdict cannot support the judgment award of damages for loss of use of the easement due to encroachment;

- the award of injunctive relief and damages for encroachment is erroneous because it amounts to an improper double recovery;

- the trial court erred in admitting the testimony of expert Wayne Godsey because his causation opinion regarding the surface water diversion was unreliable, based on a faulty foundation, and amounted to mere speculation and supposition;

- the trial court erred in admitting the testimony of expert Lonnie Marquardt because his opinions on the issue of damages for the surface water diversion and the appraised value of the Vogts' property were based on improper methodology and a faulty foundation, and amounted to mere speculation and supposition;

- the trial court erred in admitting testimony from the Vogts' experts despite timely objections;

- the evidence is legally and factually insufficient to support the jury's finding regarding the Vogts' surface water diversion claims because there is no evidence or insufficient evidence of causation and damages;

- the evidence is legally and factually insufficient to support the jury's malicious prosecution finding because the Vogts failed to prove certain required elements of the claim; and

---

[2] The parties had agreed to submit the issue of attorney's fees to the trial court for determination.

• the trial court erred in granting judgment for the Vogts because the default judgment taken against Trada Partners disposed of all parties and issues in the suit.

### *Injunctive Relief*

In its first issue, Marin contends "the evidence adduced at trial is legally and, in the alternative, factually insufficient to support the injunctive relief granted by the trial court because of the "'law of the case.'" However, in an appeal from a permanent injunction, the standard of review is clear abuse of discretion. *Triantaphyllis v. Gamble*, 93 S.W.3d 398, 402 (Tex. App.—Houston [14th Dist.] 2000, pet. denied); W. Wendell Hall et al., *Hall's Standards of Review in Texas*, 42 ST. MARY'S L.J. 1, 121 (2010). Although a litigant is entitled to a jury trial when seeking injunctive relief, the jury only determines ultimate factual issues. W. Wendell Hall et al., *Hall's Standards of Review in Texas*, 42 ST. MARY'S L.J. 1, 121 (2010). The trial court determines the "expediency, necessity or propriety" of any award of this form of equitable relief. *Id.* (quoting *Priest v. Tex. Animal Health Comm'n*, 780 S.W.2d 874, 875 (Tex. App.—Dallas 1989, no writ)).

In its final judgment, the trial court awarded the Vogts permanent injunctive relief. More specifically, the trial court found that because of Marin's action in encroaching upon the Vogts' easement, the Vogts' one-acre tract "no longer [had] passable deeded access making it unmarketable," and emergency personnel could not access the one-acre tract via the one-acre tract's 911 address. Concluding the Vogts had no adequate remedy at law and would continue to suffer irreparable injury and imminent harm as a result of the encroachment, the trial court ordered that "all buildings, fences, culverts, curbs, sidewalks, air conditioning units, and any other items and structures . . . that encroach on the easement and interfere with use of the entire twenty (20) foot easement" be removed. The trial court then permanently enjoined further

building, construction, or alterations that would interfere with or obstruct the Vogts' use of the easement. This relief is the subject of Marin's first issue.

As noted above, prior to trial, the Vogts sought a temporary injunction to restrain Trada Partners and Marin from interfering with the Vogts' use of the easement. *Id.* The trial court granted the requested injunctive relief on October 6, 2006. *Id.* Trada Partners and Marin appealed the granting of the temporary injunction, contending the Vogts had not established they would suffer a probable irreparable injury in the absence of a temporary injunction. *Id.*

This court agreed, holding the Vogts had failed to "establish a sufficient probability of irreparable injury in the absence of a temporary injunction" because Mr. Vogt admitted the obstruction of the easement did not completely deprive the Vogts of access to the one-acre parcel; they could access the one-acre parcel through their other tract of land, which was contiguous to the one-acre tract. *Id.* at *1-*2. Because the Vogts would suffer only inconvenience if the injunction was lifted, they did not establish a sufficient probability of irreparable injury, an element that must be established to obtain a temporary injunction. *Id.* at *2. In rendering our decision, we noted that our review was confined to the validity of the trial court's October 6, 2006 order. *Id.* at *1 (citing *Reagan Nat'l Adver. v. Vanderhoof Family Trust*, 82 S.W.3d 366, 370 (Tex. App.—Austin 2002, no pet.)).

Marin contends that our holding in the temporary injunction opinion operates as law of the case to preclude any award of injunctive relief. Marin argues that because this court found the Vogts have alternate access to the one-acre tract through the nineteen-acre tract, there has been no change in the factual circumstances so as to permit injunctive relief. Marin claims the law of the case doctrine requires we sustain their first issue. Marin is incorrect.

Under the law of the case doctrine, a question of law previously decided on appeal governs a case throughout its subsequent stages. *Jones & Gonzalez, P.C. v. Trinh*, 340 S.W.3d 830, 836 (Tex. App.—San Antonio 2011, no pet.) (citing *Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986)); *Lifshutz v. Lifshutz*, 199 S.W.3d 9, 20 (Tex. App.—San Antonio 2006, pet. denied). The doctrine operates to narrow the issues in successive stages of litigation and is based on goals of uniformity of decisions and judicial economy. *Lifshutz*, 199 S.W.3d at 20 (citing *Hudson*, 711 S.W.2d at 630). The doctrine applies only to questions of law and not to questions of fact. *Id.* For example, in an earlier opinion in *Trinh*, this court had held Trinh breached a lease as a matter of law because he failed to obtain insurance coverage. *Trihn v. Richter*, No. 04-04-00644-CV, 2005 WL 2989278, *1 (Tex. App.—San Antonio Nov. 9, 2005, no pet.) (mem. op.). We remanded the matter to the trial court for further proceedings. *Id.* When the matter returned to this court on appeal after proceedings on remand, we held the trial court erred in submitting the breach of lease issue to the jury on remand because we had already determined that issue as a matter of law and it was the law of the case for all subsequent proceedings. *Trinh*, 340 S.W.3d at 836.

In the matter before us, the issue that Marin claims is "law of the case" and should govern in this appeal was not a question of law previously decided by this court, but a finding that the Vogts had failed to prove *facts* necessary to establish irreparable harm for purposes of the temporary injunction. There is nothing in our opinion to suggest we held there was no irreparable harm as a matter of law. We did not rule the evidence "legally insufficient," which would have invoked the doctrine. *See Lifshutz*, 199 S.W.3d at 20. A ruling on a question of law is essential to the applicability of the law of the case doctrine. *Id.* (citing *Hudson*, 711 S.W.2d at 630). Accordingly, because we did not rule upon a question of law in our previous opinion, the

law of the case doctrine is inapplicable and the trial court did not commit a clear abuse of discretion in granting the permanent injunction based on Marin's law of the case argument.

Moreover, the granting of the temporary injunction order and the subsequent appeal both took place in 2006; the trial on the merits took place in 2009. Obviously, circumstances could have changed or the Vogts could have presented different or more compelling evidence in 2009 than they did in 2006. Their failure or inability to present such evidence in 2006 is no bar to presentation of such evidence in 2009 in support of their request for a permanent injunction. Clearly, facts and circumstances may change over the course of three years. *See Persyn v. Ishihara*, 608 S.W.2d 279, 280 (Tex. Civ. App.—San Antonio 1980, no writ) (holding that granting or refusing of temporary injunction is subject to "very different character of appellate review" from granting or refusing of permanent injunction).

The foregoing challenge is the only challenge to injunctive relief contained in Marin's opening brief. However, in its reply brief, Marin raises a myriad of other issues relating to the permanent injunction, including: (1) there is no evidence of irreparable harm that would allow the award of a permanent injunction because the evidence shows the Vogts have other means to access the one-acre tract; (2) there is insufficient evidence specifically describing the encroachments and the property boundaries so as to permit an award of a permanent injunction; (3) there is no jury question or finding regarding the true and correct location of the boundary line; (4) the uncontroverted evidence showed the encroachment of Marin's culvert/drainage basin extends onto a Texas Department of Highways right of way, not the easement, and therefore the trial court erred in submitting jury question eleven; (5) the permanent injunction lacks "the necessary specificity for enforcement and violate[s] Rule 683 of the Texas Rules of

Civil Procedure"; and (6) the permanent injunction is unconstitutional because it is too vague to be enforced.

We decline to address these issues. Although related to the award of injunctive relief, the issues Marin raises in the reply brief are wholly different from the single issue raised and argued in Marin's opening brief, which only challenged the permanent injunction based on the law of the case doctrine. *See Bankhead v. Maddox*, 135 S.W.3d 162, 164 (Tex. App.—Tyler 2004, no pet.) (holding issues raised for first time in reply brief may not be considered, except perhaps in exceptional cases) (citing *Krumb v. Porter*, 152 S.W.2d 495, 496 (Tex. Civ. App.—San Antonio 1941, writ ref'd)); *see also Anderson Prod. Inc. v. Koch Oil Co.*, 929 S.W.2d 416, 424 (Tex. 1996) (court declined to consider issue first raised in reply brief); *Lopez v. Montemayor*, 131 S.W.3d 54, 61 (Tex. App.—San Antonio 2003, pet. denied) (court declined to consider issue not raised in appellant's original brief or raised in response to appellee's brief). The many issues raised in Marin's reply brief with regard to the permanent injunction were not raised in the original brief, and cannot be said to be responsive to the arguments contained in the Vogts' brief, other than for the fact that they relate to the injunction. *See* Tex. R. App. P. 38.3 (stating appellant may file reply brief addressing any matter in appellee's brief); *Lopez*, 131 S.W.3d at 61. Accordingly, these issues are not properly before the court.

### *Loss of Use*

In the charge, the jury was asked to determine the value of the Vogts' loss of use of the easement from the date of the first encroachment to the present. The jury answered, "$30,000.00." Marin asserts the trial court erred in granting judgment for the Vogts on their loss of use claims because "there was no evidence or insufficient evidence that any of the

Appellants/Defendants were involved in the design, construction or placement of any structures or other constructions [sic] onto the easement or of damages for loss of use of easement."

### *Design, Construction, Placement*

In the jury charge, the jury was asked in questions one through nine if improvements from the eight lots in the development and the property owned by Marin encroached upon the easement owned by the Vogts. Marin seems to contend that even though the jury answered "yes" to each question, judgment could not be entered against it or the other property owners because there was no evidence any individual property owner "designed, constructed or placed any structures, improvements or other construction onto the easement." Rather, the evidence at trial showed only that the individual property owners, including Marin, purchased specific lots from the developer, Trada Partners. Thus, it seems Marin's position is that a property owner cannot be responsible for loss of use even if his property encroaches upon the property of another, rendering it useless, unless the property owner designed, constructed, or placed the encroachment on the property of another.

Marin does not cite any authority, nor have we found any, for the proposition that a property owner who encroaches upon the property of another must have designed, built, or placed the encroachment on the other person's property to be held liable for loss of use. And, in fact, the authority cited by the Vogts is contrary to Marin's assertion.

In *Allen v. Va. Hill Water Supply Corp.*, the defendant's predecessor in title constructed a building that encroached onto the adjacent lot owned by the plaintiff. 609 S.W.2d 633, 634 (Tex. Civ. App.—Tyler 1980, no writ). When the defendant purchased his lot, he did not know the building on the lot encroached upon the neighboring lot. *Id.* Nevertheless, he was sued by the plaintiff and the trial court ordered him to remove the encroaching portion of the building and

to pay damages to the plaintiff. *Id.* On appeal, the defendant claimed, as Marin does here, he should not be held liable for removing a building which he had no part in placing upon the plaintiff's property. *Id.* Rejecting the defendant's argument, the court of appeals held that even though the building was built by the defendant's predecessor in title and possession, the defendant was required to remove the encroaching portion of the building and to pay the plaintiff damages. *Id.* at 636.

Here, as in *Allen*, the fact that Trada Partners designed, built, and placed the encroachments on the easement does not absolve the individual property owners from liability to the Vogts. *See id.* The mere fact of ownership of an encroaching structure is sufficient to establish liability. *See id.*

In addition to the foregoing argument, Marin also makes a somewhat confusing argument, which is intertwined with the first argument, about the ambiguity of the verdict and its insufficiency to support the judgment. Perhaps Marin is contending that because questions one through eight in the jury charge did not specifically ask the jury if the lot owned by a particular person encroached upon the Vogts' easement, i.e., "Did improvements on Lot 1 owned by X encroach on the Vogts' easement?", but merely asked if improvements on "Lot 1," "Lot 2," etc. encroached upon the easement, judgment against the specific landowners was improper. This argument is without merit.

First, this argument was not raised during the jury charge conference, or in either the motion for judgment notwithstanding the verdict or motion for new trial. Therefore, it has been waived. *See* TEX. R. APP. P. 33.1(a). Substantively, there is a good reason Marin did not raise the argument below, and we find it disingenuous that Marin chose to assert it on appeal. In the court below, Marin's attorney, on behalf of Marin and the individual owners, and counsel for

Vogt specifically agreed the encroachment claims against the individual lot owners would be submitted to the jury on a lot-by-lot basis rather than by using the name of the individual owner of the lot:

> The Court: Counsel, before we bring the jury in, do you want to make that stipulation in the record?
>
> Mr. Schulte [Vogts' counsel]: Yes, the parties have agreed as follows:
>
> As to lots 1 through 8, we have stipulated that the owners of those lots are the parties identified yesterday, Derra Edwards, Lot 1: Shees, Lot 2; Dresden & Goldberg Investco, Lot 3; Leal Urgin is Lot 4; G2 Assets was Lot 5; The Boerne Trust was Lot 6; Hugh Lam was Lot 7; and the Maganaris Trust was Lot 8.
>
> *    *    *
>
> The Court: Is that your stipulation, also, Mr. Prins?
>
> Mr. Prins [Counsel for Marin]: Yes, it is, Judge.
>
> The Court: On behalf of all your clients?
>
> Mr. Prins: Yes.
>
> The Court: And, likewise, the reason we are doing the stipulation on Lots 1 through 8, I don't think you – references in proposed Question 1 through 8 in the Court's Charge deal with the encroachment of the easement or extension onto the easement of the Vogts, and rather than name each person in each question, if there is a finding of Lot 1 as referenced in the question, will pertain to that – that particular owner as just stipulated to, Lot 2 and so forth. Is that understood, counsel?
>
> Mr. Prins: Yes.

Based on the exchange quoted above, Marin is complaining about alleged charge error and error in the judgment that occurred as a result of its own stipulation. Marin, through counsel, specifically stipulated to submit the questions regarding encroachment onto the easement by lot number rather than by owner and agreed that any finding by lot number would relate to the specific lot owner as stated in the stipulation–thereby justifying a judgment based on the lot

finding. This agreement entered in open court on the record amounts to a valid Rule 11 agreement to which Marin is bound. *See* TEX. R. CIV. P. 11. With regard to question nine, it did not submit the encroachment issue by lot, but asked if property owned by Marin encroached on the easement. This jury finding clearly supports the judgment against Marin for loss of use. Thus, contrary to Marin's assertions, we need not speculate as to what the jury intended when answering questions one through nine. Based on the jury findings and the parties' stipulation, we can determine exactly which property owned by which owner encroached, according to the jury, on the Vogts' easement. Thus, Marin's argument is erroneous and unsubstantiated by the record.

With regard to the damage question, jury question number ten, if Marin is likewise contending this submission was erroneous because it did not sufficiently tie damages to each individual defendant, this claim is waived. *See Barnett v. Coppell N. Tex. Court, Ltd.*, 123 S.W.3d 804, 820 (Tex. App.—Dallas 2003, pet. denied) (holding appellant waived charge error by failing to object to trial court's failure to segregate damages for three separate theories of liability); *Domingues v. City of San Antonio*, 985 S.W.2d 505, 512 (Tex. App.—San Antonio 1998, pet. denied) (holding that if City wanted to ensure attorney's fees would not be included in jury's computation of arbitration expenses, it should have requested separate issue for each damage element); *cf. Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 387 (Tex. 2000) (holding appellant preserved complaint that trial court erred in submitting single broad-form question on liability when thirteen independent grounds of liability were described in instructions by objecting that one independent ground of liability was invalid). Marin did not object to the use of a broad form damage question for damages, nor did it request that damages be parsed into separate questions for each individual property owner.

*Insufficient Evidence of Damages*

Although Marin broadly asserts there is no evidence or insufficient evidence as to damages for loss of use, Marin wholly fails to argue this assertion. Marin merely states, with regard to damages: (1) "Appellants/Defendants also objected to Question 10 on the basis that there was no evidence of damages that have been quantified for loss of use of easement[;]" and (2) "Further, the submission of Question 10 was improper because there was no evidence of insufficient evidence of quantified damages for loss of use of easement." Marin's actual argument is limited to the issues discussed above.

Accordingly, we hold Marin has waived its sufficiency challenge to the amount of damages by failing to properly brief the issue. Rule 38.1(i) of the Texas Rules of Appellate Procedure requires an appellant's brief to contain a clear and concise argument for the contentions made. TEX. R. APP. P. 38.1(i). This requirement is not satisfied by conclusory statements. *Taylor v. Meador*, 326 S.W.3d 682, 683 (Tex. App.—El Paso 2010, no pet.); *see Eastin v. Dial*, 288 S.W.3d 491, 501 (Tex. App.—San Antonio 2009, pet. denied) (holding contention that affidavit in support of attorney's fees was conclusory was waived for failure to present argument or cite authority). A failure to provide substantive analysis of an issue waives the complaint. *Id.*

As reflected in the description of Marin's "argument" in support of its sufficiency claim as to damages for loss of use, Marin's brief failed to meet the basic requirements of a clear and concise argument containing substantive analysis. Rather, the brief contains three conclusory statements (the description of the issue and the two statements set out above), each of which essentially says there was no evidence of damages. *See, e.g., Garza v. Garza*, No. 02-04-220-CV, 2005 WL 1047589, *1 n.2 (Tex. App.—Fort Worth 2005, pet. denied) (mem. op.) (holding

appellant's one-sentence complaint that "the evidence is insufficient to support the judgment" was waived based on inadequate briefing). Marin has therefore waived this portion of issue two due to inadequate briefing. *See generally Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994) (holding error may be waived by inadequate briefing).

### *Improper Double Recovery*

Marin contends, in its third issue, that the trial court erred in awarding the Vogts both damages for loss of use and a permanent injunction because it amounts to an improper double recovery. Whether the Vogts received a double recovery is a question of law, and therefore in reviewing this issue, we conduct a de novo review. *See In re Humphreys*, 880 S.W.2d 402, 404 (Tex. 1994) (holding questions of law are always subject to de novo review); *George v. Price*, 321 S.W.3d 164, 166 (Tex. App.—Eastland 2010, no pet.) (same); *Calstar Props., L.L.C. v. City of Fort Worth*, 129 S.W.3d 433, 440 (Tex. App.—Fort Worth 2004, no pet.) (recognizing that whether plaintiff received double recovery is question of law).

A party is entitled to bring suit and seek damages on alternative theories; however, the plaintiff may not recover on both theories because these would amount to a "double recovery." *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998); *Foley v. Parlier*, 68 S.W.3d 870, 882 (Tex. App.—Fort Worth 2002, no pet.). A double recovery exists when a plaintiff is awarded more than one recovery for the same injury. *Waite Hill Servs.*, 959 S.W.2d at 184; *Foley*, 68 S.W.3d at 882-83. "Texas law does not permit double recovery." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 441 (Tex. 1995). The prohibition against double recovery is a corollary to the one satisfaction rule, *Foley*, 68 S.W.3d at 883, which provides that a plaintiff may recover only for the damages suffered as a result of a particular injury. *Utts v. Short*, 81 S.W.3d 822, 833 (Tex. 2002).

In this case, the jury was asked to determine, in the event it found any encroachment upon the Vogts' easement, what sum of money would compensate the Vogts for the loss of use of the easement. The jury was specifically instructed that in considering damages for the Vogts' loss of use, it should consider the value of the use from the date of the first encroachment to the present. The jury was not asked about future damages for loss of use of the easement. Having found there were encroachments upon the easement, the jury answered the loss of use damage question and found $30,000.00 would compensate the Vogts for their loss from the date of the first encroachment to the present. In its judgment, the trial court awarded the Vogts $30,000.00 for loss of use of the easement. The trial court also awarded the Vogts a permanent injunction, which required removal of the encroachments.

As noted above, the Vogts did not ask for future damages for their lost use of the easement. Rather, they sought only past damages. The permanent injunction, which required removal of the encroachments, would negate any future losses based on an inability to use the easement because once the encroachments are removed, the Vogts will again be free to access the easement. Accordingly, we hold there was no double recovery. The supreme court has specifically recognized that only when a judgment awards "both an injunction and damages as to future effects" is there an impermissible double recovery. *Schneider v. Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 284 (Tex. 2004). In the absence of an award of future damages, there is no double recovery. *See id.* As one court of appeals recognized, an award of permanent injunctive relief and past damages was not a double recovery because no future damages were awarded. *F.S. New Prods., Inc. v. Strong Indus., Inc.*, 129 S.W.3d 606, 631-32 (Tex. App.—Houston [1st Dist.] 2004), *rev'd in part on other grounds*, 221 S.W.3d 550 (Tex. 2006).

These more recent cases, as noted in the Vogts' brief, simply restate longstanding Texas law. As stated by the Second Court of Appeals in 1945, in a case rejecting the appellant's argument that allowing the appellee to recover damages for past loss of value of their lands and to obtain a permanent injunction preventing future interference with that use was an improper double recovery:

> There is no election of remedies in a case of this character. The equitable remedy by injunctions to stop a wrong and remedy it, when it can be done, is not an inconsistent remedy to the injured party's right to have redress during the time the wrong existed. In this state legal and equitable rights are blended and a choice of remedies for either equitable or legal relief is not required in a case like this.

*City of Wichita Falls v. Bruner*, 191 S.W.2d 912, 920 (Tex. Civ. App.—Fort Worth 1945, writ ref'd w.o.m.).

Marin's complaint is identical to that rejected by the courts in *F.S. New Prods.* and *Bruner*, and the trial court's award of past damages and a future injunction is in line with the supreme court's statements in *Bates*. The Vogts were not awarded future damages and an injunction; rather, they received damages to redress the time when they lost the use of their easement due to the encroachments, and injunction to prevent future loss of use. Accordingly, we overrule this issue

### *Admission of Expert Testimony*

The Vogts alleged Trada Partners and Marin, through construction of the development, diverted the natural flow of surface water in violation of the Texas Water Code, resulting in damage to both the one-acre and nineteen-acre tracts. In issues four through six, Marin challenges the admission of expert testimony presented by the Vogts in support of this allegation.

In issues four and five, Marin challenges the admission of testimony from Wayne Godsey, a civil engineer who testified about surface water diversion, and Lonnie Marquardt, a

real estate appraiser who testified about damages based on the alleged surface water diversion. Issue six seems to be nothing more than a general procedural complaint about the admission of the expert testimony complained of in issues four and five. It seems that Marin is generally arguing the Vogts failed to establish the admissibility of their experts' testimony–that is precisely what is under review in issues four and five. Accordingly, issue six does not require separate review. We will therefore proceed with our review of issues four and five.

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006) (quoting TEX. R. EVID. 702); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588-89 (1993). Expert testimony is admissible when the expert is qualified and his testimony is relevant and based on a reliable foundation. *Mendez*, 204 S.W.3d at 800. If the expert's scientific evidence is speculative or unreliable, it is not evidence. *Id.* The trial court's determination that these requirements are met is reviewed for abuse of discretion. *Id.* A trial court abuses its discretion if it acts without reference to any guiding rules or principles. *Id.* Admitting expert testimony that does not meet the reliability requirement is an abuse of discretion. *Id.*

The supreme court has held that bare, baseless opinions will not support a judgment, even in the absence of an objection:

> [A]lthough expert opinion testimony often provides valuable evidence in a case, "it is the basis of the witness's opinion, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law; a claim will not stand or fall on the mere ipse dixit of a credentialed witness." *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999). Opinion testimony that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact "more or less probable." *See* TEX. R. EVID. 401. This Court has labeled such testimony as "incompetent evidence," and has often held

that such conclusory testimony cannot support a judgment. [citations omitted] Furthermore, this Court has held such conclusory statement cannot support a judgment even when no objection was made to the statement at trial. [citations omitted]

*City of San Antonio v. Pollock*, 284 S.W.3d 809, 816 (Tex. 2009) (quoting *Coastal Transp. Co. v. Crown Central Petrol. Corp.*, 136 S.W.3d 227, 232 (Tex. 2004)). The supreme court has held that when testimony is challenged as conclusory or speculative, no objection is necessary because there is no need for the court to go beyond the face of the record to test its reliability. *Id.* Only when the reliability of the expert's testimony is challenged based on underlying methodology, technique, or foundational data used by the expert is a timely objection required because then the trial court is required to go beyond the face of the record to determine reliability. *Id.*

## *Civil Engineer*

In support of their claim of diversion, the Vogts proffered the testimony of Wayne Godsey to establish the actions of Trada Partners and Marin caused the surface water diversion that allegedly resulted in flooding of the Vogts' property. In issue four, Marin complains about the admission of Wayne Godsey's testimony, arguing the trial court erred in admitting Godsey's testimony because his causation opinion was "unreliable and based on a faulty foundation and amounted to no more than a mere speculation and supposition." The Vogts respond by arguing (1) Marin waived error by failing to object on the exact grounds raised on appeal, and (2) contrary to Marin's argument, Godsey's testimony was not on the design of the drainage culvert so his failure to study the design plan or determine what caused the culvert to overflow is not fatal to his testimony.

First of all, with regard to waiver, the supreme court's holding in *Pollack* disposes of the Vogts' claim that Marin has waived error with regard to Godsey's testimony. We hold that

Marin's contention on appeal, and at trial, was that Godsey's testimony was pure speculation. This is the type of challenge for which an objection is not required because the court need look no further than the face of the record to determine the reliability of the expert's opinion. *See Pollock*, 284 S.W.3d at 816. Accordingly we must review this issue.

Godsey is a civil engineer with twenty-five years' experience in civil engineering, design, planning, and construction management, and owns a firm specializing in "drainage and infrastructure design related with drainage and land development projects." The firm's work includes surface water control, flood studies, and dam inspections and design. Godsey testified he has been involved in a project similar to the Trada Partners's development.

When he was first contacted by Mr. Vogt, he told him he would like to take a look at the development before agreeing to do any work on the Vogts' behalf. He testified he and Mr. Vogt drove around the project, which was still under construction, and at that time he noticed several areas that impacted historical drainage patterns relative to the Vogts' property. After this first inspection, he agreed to work for the Vogts, stating he believed they had been impacted because of the development.

Godsey testified he conducted a site visit and inspection, and then reviewed construction plans for the development that Mr. Vogt provided and others that were on file with the City of Boerne. He reviewed drainage documents from Pape-Dawson, the engineering firm hired to work on the development, which were provided by the Vogts' attorney. He also received information from Mr. Vogt about the flooding and viewed pictures of the flooding. Godsey was advised by Mr. Vogt that until the new development, the Vogts' property had never flooded as it did after the construction of the development. Godsey testified Mr. Vogt told him that

historically there was a ditch that took surface water through the property upon which the development was built.

Godsey used a drainage flow diagram from the Pape-Dawson files to show the jury the historical flow of surface water before the development. According to Godsey, before the development, rainwater would drain off through the development tract, but by elevating portions of the development, the water flow was redirected so that the overflow drained onto the Vogts' property when, during a heavy rainfall, a culvert backed up. Godsey testified he viewed the property and observed the increase in elevation in relation to the Vogts' property.

Godsey was also asked about a culvert that apparently backed up during a large rainstorm. Godsey testified based on his inspection and the information provided by Mr. Vogt and the documents he reviewed, there were several reasons the culvert may have overflowed. On voir dire and during cross-examination, Godsey admitted he had not seen the culvert design, had no opinion whether the design was improper because he had not seen it, and admitted any opinion he had on what might have happened was a "potential" opinion because he was unaware of the actual design of the culvert. Godsey also admitted he did not know why the culvert backed up, and the only information he had regarding the culvert came from Mr. Vogt. He admitted he knew nothing about the design of the culvert, had no knowledge if the culvert's capacity was exceeded, and could only speculate that the culvert had been blocked by debris. Godsey stated he could not opine on any other possible causes–other than those he relayed during his direct testimony–but admitted he did not know what caused the culvert in this case to back up. He admitted his opinion on the cause of the back up in this case applies to any back up in any culvert.

Marin contends Godsey's testimony is speculative and cannot support a finding of causation because he cannot definitively say why the culvert backed up. The Vogts contend Marin has misinterpreted Godsey's testimony. After a thorough and detailed review of Godsey's testimony, we agree with the Vogts.

Godsey's opinion was that the Vogts' property flooded because of an increase in elevation of the development relative to the Vogts' property. This testimony was neither speculative nor otherwise unreliable. Godsey specifically testified the increase in elevation altered historical surface water drainage patterns, and his testimony was based on his own visual inspection of the property where he noted diversions from the historical drainage patterns due to increases in elevation, as well as a drainage area map used by Pape-Dawson, the company that constructed the development. Godsey opined that historically water drained back onto the property upon which the development was constructed, but Trada Partners and Marin "blocked that flow" by increasing the elevation of the development in relation to the Vogts' property, forcing the surface water to flood the Vogts' property. We hold this testimony is neither speculative nor unreliable, and is supported by a proper predicate and a proper foundation.

As for Marin's claims about Godsey's testimony regarding the culvert, we agree it is indeed speculative–Godsey could not say what actually blocked the culvert and caused it to overflow. However, we do not interpret Godsey's testimony to suggest the culvert was the cause of the surface water diversion that resulted in the flooding of the Vogts' property. As Godsey noted, before the development, "the ground was lower and there was a ditch that headed off . . . and the water would just head off . . . through the baseball field property." However, as a result of the development, the property was elevated, precluding historical run-off through the development property. Thus, we hold Godsey did not opine that the culvert caused the flooding;

rather, he opined that the increase in elevation due to construction of the development caused surface water diversion that resulted in flooding of the Vogts' property. We find Marin's complaints about the speculative nature of the "culvert testimony" unconvincing and we overrule Marin's challenge to Godsey's testimony.

### Real Estate Appraiser

Marin also complains the trial court erred in admitting the expert testimony of Lonnie Marquardt on the issue of damages for the alleged surface water diversion. Marin contends "his methodology was improper, his opinion was based on a faulty foundation, and his opinion amounted to no more than speculation and supposition." Although this is the complaint stated in Marin's fifth issue, a review of its argument reveals Marin is challenging the admission of Marquardt's testimony based on improper methodology and lack of foundation.

The Vogts contend, as they did with regard to Godsey's testimony, that Marin failed to preserve this issue for our review. Again, we disagree, but for a different reason. Because Marin is challenging the reliability of Marquardt's testimony based on alleged improper methodology and lack of foundation, an objection was required. *See Pollock*, 284 S.W.3d at 816. However, contrary to the Vogts' assertion, Marin did object–in writing before trial and during Marquardt's testimony–in a manner sufficient to apprise the trial court of its complaints and allow the trial court to rule. *See* TEX. R. APP. P. 33.1(a). We will, therefore, review this issue.

Marquardt is an independent real estate broker and appraiser. He testified he is certified by the State, and has a "GAA," which means he is a general accredited appraiser through the National Association of Realtors. Marquardt stated he has been accepted as an expert appraiser for the Texas Department of Transportation and numerous federal, district, and county courts in south Texas.

Marquardt testified he was asked by the Vogts to evaluate whether their property–both the one-acre and nineteen-acre tracts–have suffered a diminution in value. As to the one-acre tract, Marquardt was tasked with determining whether it had been devalued due to the loss of the easement and the potential for flooding. With regard to the nineteen-acre tract, he was only to determine any decrease in value based on the potential for flooding.

Marquardt stated that to make his determination, he performed what is known as a "before and after" analysis for each property. For the one-acre tract, Marquardt had to develop an estimate of the market value of the one-acre tract assuming legal ingress and egress provided by a twenty-foot wide passable easement and no surface water flooding. He would then develop an estimate of the market value of the one-acre tract as "landlocked" and prone to flooding due to significant surface water drainage. Marquardt specifically stated he developed his estimate based on the one-acre tract as a property independent from the nineteen-acre tract. To develop his estimate, he researched comparable sales in an attempt to find the best comparison possible. "Comparables," according to Marquardt, are normally relied upon by appraisers in making these types of determinations. Marquardt also prepared his appraisal using the "highest and best use" analysis, which requires the appraiser to consider what is the potential best use for the property being appraised, i.e., residential, commercial, agricultural, etc.

Using the foregoing methodology, Marquardt testified that the value of the one-acre tract before the loss of the easement and before it was subject to flooding was $2.00 per square foot, for a total value of $79,366.32 given the size of the property. However, in the absence of a passable easement and a likelihood of flooding due to surface water diversion, the market value of the property fell to $0.20 per square foot, for a total value of $7,936.63. This meant a change

in value due to the loss of the easement and the increased chance of flooding of $71,429.69. The jury found the Vogts' damages to be $71,000.00 for Marin's alleged diversion of surface water.

Marquardt stated he used the same methodology for the nineteen-acre tract, and determined its value before the alleged increased potential for flooding to be $3.50 per square foot, for a total value of $1,219,680.00. Marquardt indicated that in making this determination, the highest and best use analysis called for him to consider only the eight acres on Highway 87 for commercial use–the remaining acreage was insignificant in this context. Marquardt then testified the value of the nineteen-acre tract, given the flooding problems, decreased in value to $2.10 per square foot, for a total value of $731,808.00. This was a change in value of $487,872.00, which was the exact amount awarded by the jury.

Marin first argues the trial court should have excluded Marquardt's testimony because diminution of value was the improper measure of damages, and therefore Marquardt's opinion was based on an improper foundation and methodology. Marin's argument is based on its contention that the damages to the Vogts' property were "temporary" as opposed to "permanent." However, we need not decide if Marquardt used an improper damage model because Marin failed to raise an issue on appeal challenging the jury's findings that the damage to both the one-acre and nineteen-acre tracts was permanent.

Unchallenged jury findings are binding on this court. *See Abatement, Inc. v. Williams*, 324 S.W.3d 858, 862 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); *Carbona v. CH Med., Inc.*, 266 S.W.3d 675, 687 (Tex. App.—Dallas 2008, no pet.). Thus, the jury's finding that the damage to the one-acre and nineteen-acre tracts was "permanent" is binding on this court. *Id.* And, case law holds that diminution in value is the proper measure of damages for permanent injury to land. *Royce Homes, L.P. v. Humphrey*, 244 S.W.3d 570, 577 (Tex. App.—Beaumont

2008, pet. denied); *Mieth v. Ranchquest, Inc.*, 177 S.W.3d 296, 303 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *Rocho v. U.S. Home/Homecraft Corp.*, 653 S.W.2d 53, 56 (Tex. App.—San Antonio 1983, writ ref'd n.r.e.). Accordingly, because the jury found the damage to the Vogts' land is permanent, and we are bound by this finding, the diminution in value model used by Marquardt was the proper measure of damages.

Marin also challenges the reliability of Marquardt's testimony based on his considering of "highest and best use" given Mr. Vogts' testimony that he did not intend to sell, develop, or otherwise change the use of his property. However, Mr. Vogt explained that although he had no present intention to sell the property, he was "just short of 80" and he did not mean to imply by his testimony that his children or other successors in interest might have the same intentions. Moreover, Mr. Vogt testified he did not believe he could even sell the one-acre tract given the absence of the easement.

Marin has not cited any authority, nor have we found any, to suggest that an appraiser may not use "best and highest use" when appraising property for a diminution in value. In fact, in condemnation cases, the supreme court has held a factfinder may consider the highest and best use of land in determining market value. *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 628 (Tex. 2002). Moreover, in determining fair market value in condemnation proceedings, the preferred method is to use comparable sales, just as Marquardt did here, and in making that determination, consideration of highest and best use is proper. *See City of Sugarland v. Home and Hearth Sugarland, L.P.*, 215 S.W.3d 503, 512 (Tex. App.—Eastland 2007, pet. denied). We can find no reason to hold highest and best use inapplicable here, particularly given Marquardt's undisputed testimony that appraised market value assumes "highest and best use" even if the

property is not currently being used that way, and there is "no such thing" as appraising based on "current use."

The only authority cited by Marin simply recognizes that when valuing property using comparables, the property used for comparison must actually compare to the property being valued. *See Guadalupe-Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 806-07 (Tex. 2002). In that case, the court found the expert's testimony unreliable because he did not use a comparable sale of property for his comparison; rather, he could not find a comparable sale, so he "reconfigured" the client's easement to a rectangular 3.2 acre tract and hypothetically "relocated" it to facilitate his comparative analysis. *Id.* Here, there is no suggestion Marquardt did not use comparable sales or "reconfigured" the Vogts' property because he was unable to find comparable sales. Thus, the authority cited by Marin is inapplicable.

Next, Marin claims Marquardt's testimony was unreliable because "he did not follow the methodology necessary for the admission of appraisal evidence." Marin is contending that because Marquardt did not prepare a complete appraisal report in accordance with the Uniform Standards of Professional Appraisal Practice ("USPAP"), which would have been twenty-five to thirty pages in length and contained certain information his summary report did not, Marquardt did not use proper methodology, rendering his opinion unreliable. We disagree.

First, Marquardt specifically testified he did all the work necessary for a complete USPAP report, he simply did not prepare a complete report, but instead prepared a summary report. Marquardt described all of the items that would be in a full report as opposed to a summary, e.g., identity of the client, intended users, intended use of appraisal, identify property, signed certification, etc. Although he did not prepare a full report, Marquardt testified he used the methodology required by the USPAP. The case cited by Marin to suggest Marquardt's

testimony was inadmissible is inapposite. *See Bufkin v. Bufkin*, 259 S.W.3d 343 (Tex. App.—Dallas 2008, pets. denied). In that case, the court held the expert appraiser's testimony regarding the value of a ranch was properly stricken because he admitted using a method suggested by the attorney that was not proper under the USPAP and he had never valued real estate "that way" before. *Id.* at 351-52. Here, Marquardt used USPAP methodology, he simply did not prepare a full report. Marin has cited no authority to suggest that the failure to prepare a specific kind of report, when a summary report and testimony contains the necessary information required by the accepted methodology, renders an expert's testimony unreliable.

Finally, Marin argues Marquardt's testimony was unreliable and should have been excluded because it was based on information provided by the Vogts, which was insufficient. We disagree. Marquardt was asked to determine the value of damages assuming a lost easement and flooding–this is exactly what he did.

### Surface Water Diversion

As previously noted, the Vogts sought damages for Marin's alleged diversion of surface water. In its seventh issue, Marin contends the evidence is legally and factually insufficient to support the jury's findings of causation and damage with regard to this claim.

When reviewing a legal sufficiency or "no evidence challenge," we determine "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Id.* We must assume jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it." *Id.* at 819. We will sustain a legal sufficiency challenge when: (1) there is a complete absence of

evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). In contrast, when reviewing a factual sufficiency challenge, we consider and weigh all the evidence supporting and contradicting the finding. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We will set aside the finding only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). In undertaking either review, we are mindful that jurors are the sole judges of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819. Jurors may choose to believe one witness and disbelieve another. *Id.* We may not substitute our judgment for that of the jury, even if we might reach a different answer based on the evidence. *Id.*

### *Causation*

In challenging the sufficiency of the evidence supporting causation, Marin first contends the speculative nature and basis of Godsey's testimony–the only causation testimony with regard to surface water diversion–renders the evidence legally and factually insufficient. Because we have held Godsey's testimony was not speculative, and that it was based on more than anecdotal evidence, we hold this contention is without merit. Godsey's testimony was based on more than Mr. Vogts' words and flooding photographs. Godsey based his testimony on his own experience regarding development of properties in light of surface water flow, his personal view of the properties, and documents showing historical drainage patterns on the property.

Marin next contends that even if Godsey's testimony is reliable, there is still "no evidence" of surface water diversion because Godsey's testimony establishes the water that was diverted was not "surface water" because the water allegedly diverted was controlled by a culvert. *See* TEX. WATER CODE ANN. § 11.086 (West 2008).

Section 11.086 of the Texas Water Code provides that no person may divert the natural flow of surface water in a manner that damages the property of another. *Id.* § 11.086(a). If a person's property is injured by an overflow of water caused by an unlawful diversion, that person may seek remedies at law and in equity, including damages. *Id.* § 11.086(b).

Marin's argument is based on its misplaced belief, as discussed with regard to the admissibility of Godsey's testimony, that the water that flooded the Vogts' property was water from the culvert, and that the Vogts sought recovery because rainwater was improperly controlled by a ditch or culvert. Rather, the Vogts alleged surface water was diverted by an increase in elevation, the building of earthen pads, and the deposit of debris and erection of barriers. As we noted above, Godsey did not opine that the back up and overflow of water from the culvert resulted in the flooding of the Vogts' property. Rather, Godsey testified that when the elevation of the development was increased relative to the Vogts' property, historical drainage patterns for surface water were altered and this caused the flooding. Thus, Godsey was talking about surface water, i.e., water that is diffused over the ground from falling rain or melting snow. *See Dietrick v. Goodman*, 123 S.W.3d 413, 419 (Tex. App.—Houston [14th Dist.] 2004, no pet.). If anything, Godsey's testimony was that surface water could not be controlled by the culvert because of the disparity in elevation between the development and the Vogts' property. Thus, we hold the evidence is legally sufficient to establish that the water which Godsey asserted flooded the Vogts' property was not under the control of the culvert so as

to remove it from the category of surface water for purposes of section 11.086 of the Water Code. *See id.* (noting that chief characteristic of surface water is that it does not follow defined course or channel and does not gather into or form natural body of water). We hold this case involved a classic example of surface water – water diffused over the ground from falling rain – diverted by a change in elevation because of the construction of the development. Accordingly, we overrule this issue.

## *Damages*

Marin also contends the evidence of damages for surface water diversion is insufficient– specifically legally insufficient. Marin reurges its argument that the damage to the Vogts' land by flooding, if any, was temporary, and therefore Marquardt used an improper damage model. For the reasons discussed in the portion of the opinion reviewing the admissibility of Marquardt's testimony, we overrule this issue.

## *Malicious Prosecution*

In its eighth issue, Marin contends the evidence is legally and factually insufficient to support Mr. Vogts' claim for malicious prosecution. We note Marin has not challenged, in any way, the jury's damage award of $1,000,000.00 to Mr. Vogt based on his claim for malicious prosecution. Rather, Marin has challenged only certain elements of the claim. Specifically, Marin challenges the evidence to support the elements of procurement of prosecution, innocence, absence of probable cause, and malice. We note that with regard to this issue, the jury finding in favor of Mr. Vogt on malicious prosecution was against Marin only, not the individual property owners.

## *Standard of Review*

The applicable standard of review is that previously stated for legal and factual sufficiency. *See City of Keller*, 168 S.W.3d at 827; *Plas-Tex, Inc.*, 772 S.W.2d at 445; *Dow Chem. Co.*, 46 S.W.3d at 242. As always, we must remember jurors are the sole judges of the credibility of the witnesses and the weight to be given their testimony, and may choose to believe some witnesses and not others. *City of Keller*, 168 S.W.3d at 819.

## *Application*

Texas courts have long recognized a cause of action for those unjustifiably subjected to criminal proceedings, but has made it clear that such a cause of action, known as malicious prosecution, must sometimes yield to society's interest in encouraging its citizens to report crimes whether real or merely perceived. *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 792 (Tex. 2006). The elements necessary to recover for malicious prosecution reflect a balance of these interests. *Id.* To recover for malicious prosecution, a plaintiff must prove: (1) a criminal proceeding was commenced against the plaintiff; (2) the defendant initiated or procured the proceeding; (3) the proceeding was terminated in the plaintiff's favor; (4) the plaintiff was innocent of the crime charged; (5) the defendant lacked probable cause to initiate the criminal proceeding; (6) the defendant acted with malice; and (7) the plaintiff suffered damages. *Id.* (citing *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 517 (Tex. 1997)). The fifth and sixth elements protect a defendant from a jury's "natural inclination" to punish a defendant who erroneously, but with cause and no malice, commenced criminal proceedings that resulted in an exoneration. *Suberu*, 216 S.W.3d at 792.

To understand the origins of the criminal proceedings against Mr. Vogt, we must begin with the July 26, 2006 Rule 11 agreement between Trada Partners and the Vogts. After the

Vogts filed suit, they entered into a Rule 11 agreement with Trada Partners concerning the easement. In the Rule 11 agreement, the parties agreed, among other things, that the Vogts owned the easement and were entitled to "repair and maintain the Easement at their discretion" as long as they did not "unduly interfere with the servient estate," i.e., the development. In August 2006, when the easement became impassable due to the activities of Trada Partners and Marin, the Vogts' counsel advised counsel for Trada Partners and Marin by letter that if the easement were not restored to allow ingress and egress, the Vogts would exercise their rights under the Rule 11 agreement to maintain the easement themselves. When no action was taken, the Vogts hired a contractor to return the easement to its original condition, and the Vogts' counsel notified the attorney who represented Marin as well as Trada Partners of their intentions. In response, the attorney for Trada Partners and Marin asked for the name of the contractor in order to coordinate activities. The Vogts' attorney disclosed the name of the contractor. Thereafter, someone from Trada Partners contacted the contractor, Bradley Construction, and threatened "immediate legal action" if during the work on the easement there was any impediment to the construction process or any trespass on property outside the easement. Bradley Construction was also advised that if it worked on the easement, it would have to contact counsel for Trada Partners and Marin because he would need to "depose [the company] regarding [the] exact and complete scope of work" it intended to perform for the Vogts. The contractor, fearing involvement in the pending legal proceedings, refused to do the work for the Vogts, as did any other contractor in the area.

The Vogts then attempted to do the work themselves, which ultimately resulted in a September 19, 2006 report of criminal mischief and criminal trespass by Daniel Hill, a construction assistant superintendent for Trada Partners, to the Boerne Police Department. Hill

told the investigator dirt had been moved onto Trada Partner's property, and there was damage from excavation and to fencing along the easement. Hill advised that Trada Partners would file charges or criminal trespass and criminal mischief against those involved. On September 21, 2006, Mr. Vogt went to the police department to speak to the Chief of Police about the incident. Mr. Vogt admitting moving the dirt from the easement, but advised that Trada Partners had no authority to impede his use of the easement. It seems nothing came of this initial report; no charges were filed.

However, on Friday January 11, 2008, a second report involving Mr. Vogt and the easement was made to the Boerne Police Department. Susan Rogers, a Trada Partners employee, and the construction superintendent, Salvador Feliciano-Piedra, met with an officer concerning a report of criminal mischief. Feliciano-Piedra advised the investigator that someone had cut section of a steel fence and used orange spray paint to paint "Xs" on curbs, sidewalks, trees, and air conditioning units. Feliciano-Piedra advised the investigator about the ongoing lawsuit with the Vogts, and eventually provided a damage estimate of between $8,924.72 and $31,864.72.

The investigator spoke with some workers who apparently witnessed the spray painting, but he also spoke with John Sieckert, who was an officer with Trada Partners and associated with Marin. Sieckert called to advise that charges would be filed against the person responsible. Sieckert told the investigator "Vogt had already damaged some of their properties when they first started construction." Sieckert said he suspected Vogt was responsible for this criminal mischief as well.

The investigator then spoke with Mr. Vogt and his son. They provided the investigator with a copy of the Rule 11 agreement, which gave the Vogts the right to maintain the easement. Mr. Vogt admitted spray painting encroaching curbs, sidewalks, trees, and air conditioning units

and cutting the fence, but advised that he took the action because the damaged items obstructed his easement. Thereafter, the investigator spoke with the attorney, who represented both Trada Partners and Marin. The attorney advised the investigator that this court's opinion lifting the temporary injunction overturned the Rule 11 agreement and gave "them the right to build on the easement since there are other ways for the Vogts to access the back property." *See Trada Partners VI*, 2007 WL 163181, at *1. This court's opinion did not hold as counsel for Trada Partners and Marin claimed, nor did the opinion in any way suggest such a result. *See id.* Rather, our opinion merely held the Vogts had failed to establish irreparable harm for purposes of the temporary injunction. *Id.* We certainly did not state or even intimate that the existing Rule 11 agreement was no longer effective, nor did we state or intimate that encroachment upon the Vogts' easement was permitted. *Id.* Nevertheless, counsel for Trada Partners and Marin told the investigator he believed "Trada could completely block the easement since there is other access."

The investigator wanted to speak with Sieckert again, so he called him, but Sieckert was out. Sieckert called back and the investigator asked him to provide an affidavit regarding the filing of charges. Sieckert stated he would designate Rogers as his agent for purposes of the affidavit, and that he would call her and have her contact investigators. At Sieckert's request, Rogers provided an affidavit in which she stated Sieckert designated her as his agent for purposes of filing charges and that she did wish to file charges for the property damage.

Thereafter, the investigator, who had been in contact with the Kendall County District Attorney's office, obtained an arrest warrant for Mr. Vogt for the offense of criminal mischief, a state jail felony given the estimated amount of damages. Mr. Vogt turned himself in, was arrested, fingerprinted, and had his mug shot taken. Although Mr. Vogt was ultimately "no-

billed" by the grand jury, he testified that as a former Chief Deputy Sheriff and constable, he was extremely embarrassed by the arrest, especially after his mug shot was broadcast on television and counsel for Trada Partners and Marin talked about the case on the news of a San Antonio television station.

### 1. Procurement

Marin first argues there is no evidence or insufficient evidence to establish Marin instigated or procured any criminal proceeding against Mr. Vogt. According to the Texas Supreme Court, procurement, which is the causation element of a malicious prosecution action, occurs when a person's actions are enough to cause the prosecution, and but for the person's actions the prosecution would not have occurred. *Browning-Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 293 (Tex. 1994). A person does not procure a prosecution, however, when the decision to prosecute is left to the discretion of a law enforcement official or grand jury unless the person provides information he knows is false. *Id.*; *King v. Graham*, 126 S.W.3d 75, 78 (Tex. 2003).

Marin argues the only evidence shows a Trada Partners employee, Rogers, made the call in January 2008 that led to the arrest of Mr. Vogt; Marin had nothing to do with it. However, as the Vogts point out, although a Trada Partners employee did make the initial call, there was involvement by Marin agents as well, specifically Marin's attorney and Sieckert, and Trada Partners's involvement does not permit Marin to escape liability because a criminal prosecution may be procured by more than one person. *Lieck*, 881 S.W.2d at 293; *Daniels v. Kelly*, No. 04-09-00817-CV, 2010 WL 2935789, at * 4 (Tex. App.—San Antonio Jul. 28, 2010, no pet.) (mem. op.).

A malicious prosecution action against a corporate entity may be based on an agent taking action to procure a prosecution. *See Eans v. Grocery Supply Co.*, 580 S.W.2d 17, 21-22 (Tex. Civ. App.—Houston [1st Dist.] 1979, no writ) (malicious prosecution judgment upheld against corporation based on actions of corporate employees). There is evidence in the record showing the attorney, who represented not only Trada Partners but also Marin, provided extensive, but false, information to the Boerne Police Department investigator, essentially advising him that Mr. Vogt had no right to the easement after our opinion in the temporary injunction case. Additionally, Sieckert was involved in procuring the prosecution of Mr. Vogt. Sieckert was not only a principal in Trada Partners, but according to evidence in the record, also involved in the operation of Marin. The Vogts' exhibit 53, which was admitted into evidence, is a letter from the Kendall County Abstract Company to "Mr. John W. Sieckert" at "Marin Real Estate Partners, LP," enclosing a title commitment regarding the purchase of property in the development. And, Mr. Vogt testified it was his understanding that Sieckert "was also involved with Marin Partners." Marin never introduced any evidence to suggest Sieckert was not a principal or agent of Marin. Thus, there is some evidence Sieckert was associated not only with Trada Partners, but with Marin. Sieckert designated Rogers as his agent for the purposes of procuring charges against Mr. Vogt by the submission of an affidavit. Moreover, Sieckert advised the investigator that he wanted charges filed against the perpetrator and told the investigator "Vogt had already damaged some of their properties when they first started construction," and he suspected Vogt was responsible for this criminal mischief as well.

Accordingly, we hold there is evidence a reasonable jury could have credited in order to find Marin, along with Trada Partners, procured the prosecution, and that the evidence is not so weak as to render the jury's verdict unjust.

Marin posits a second argument as to procurement, stating that even if Marin did take action in assisting the investigator, there is still no evidence of procurement because it was up to law enforcement to decide whether to arrest and prosecute Mr. Vogt.  Marin correctly points out, as noted above, a person does not procure a prosecution when the decision to prosecute is left to the discretion of a law enforcement official or grand jury.  *Id.*; *King v. Graham*, 126 S.W.3d 75, 78 (Tex. 2003).  However, if a person knowingly provides false information to those responsible for procuring the prosecution, the person has procured the prosecution for purposes of a malicious prosecution action.  *Id.*  This exception is satisfied not only when actual false information is provided, but when the reporting person fails to report facts that might establish the accused is not guilty of any offense.  *Eans*, 580 S.W.2d at 20 (holding circumstantial evidence was sufficient for jury to have concluded corporation procured prosecution where reporting persons failed to disclose material facts favorable to accused).

We hold there is sufficient evidence in this case to establish the attorney for Marin and Sieckert, as an agent for Marin, knowingly provided false information to the investigator, thereby triggering the "false information" exception.  No attorney could have reasonably believed that our opinion in the temporary injunction case (1) overturned the Rule 11 agreement, which permitted the Vogts to remove encroachments on their easement, or (2) allowed Trada Partners or any other entity to encroach at will upon the easement.  And, the jury could have found false the statement provided by counsel for Trada Partners and Marin that the Vogts had been provided a paved route to the one-acre tract, but refused to use it.  Mr. Vogt testified at trial the he did not receive a key to the gate on the paved road until a month before the 2009 trial, and he did not receive the code for the gate at the other end of the paved road until he testified at trial that he did not have the code.  All of this was long after counsel for Trada Partners and Marin

provided information to the investigator in 2008. Additionally, Sieckert advised the investigator in a phone call that Mr. Vogt had previously damaged "their properties," which the jury could have found was false based on Mr. Vogt's testimony. Mr. Vogt specifically testified the information provided by Sieckert was untrue, as was the information provided by the attorney.

Based on the foregoing, we hold there is evidence a reasonable jury could have credited in order to find that the attorney for Trada Partners and Marin and Sieckert, as agents of Marin, provided false information to authorities, thereby placing Marin within the exception to the rule that procurement is negated if the prosecution is actually instituted by law enforcement.

*2. Innocence*

Marin next argues the evidence is legally and factually insufficient as to the element of innocence. Marin contends the grand jury's failure to indict Mr. Vogt is insufficient to establish his innocence, arguing the Vogts were required to provide more proof. Marin argues the Vogts cannot provide such evidence because Mr. Vogt admitted "vandalizing" the property, but simply escaped prosecution for his crime.

A person commits the offense of criminal mischief if, *without the effective consent of the owner*, he intentionally or knowingly damages, destroys, tampers with, or makes markings on the owner's tangible property. TEX. PENAL CODE ANN. § 28.03 (West 2011) (emphasis added). We hold there is evidence from which the jury could have determined Mr. Vogt did not act "without the effective consent of the owner" when he cut the fence and spray painted the items encroaching upon his easement.

At trial, the Vogts introduced the Rule 11 agreement, which was signed by counsel for Trada Partners and Marin. Pertinent portions of the agreement were read to the jury, specifically those portions recognizing the Vogts' ownership of the easement and their right to "repair and

maintain the Easement at their discretion so long as not to unduly interfere with the servient estate." And, contrary to counsel's assertion, our opinion in the temporary injunction appeal did not vacate or otherwise overturn this agreement. *See Trada Partners VI*, 2007 WL 163181, at *1. In fact, the Rule 11 agreement is not mentioned anywhere in our opinion. *Id.* Mr. Vogt testified that he took the actions he did in January of 2008, cutting the fence and marking sidewalks, curbs, and air conditioning units, in preparation for removing them from the easement.

We hold, based on the Rule 11 agreement and Mr. Vogt's testimony, there was sufficient evidence, both legally and factually, for the jury to answer Question 18. More specifically, the jury could have found, pursuant to the Rule 11 agreement, that Mr. Vogt had the consent of the owner to take the actions he did, especially given that all of the items cut and marked were on the easement, and not on the servient estate.

In two sentences, Marin also complains that because there was no issue submitted to the jury on "innocence," the trial court erred in rending judgment for the Vogts on the malicious prosecution claim. First, the trial court used broad form submission, as required by Texas law. *See* TEX. R. CIV. P. 277 (stating broad form submission shall be used whenever feasible); *see also Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 230 (Tex. 2005) (reaffirming use of broad form submission whenever practicable). This is true even after the court's decisions in *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378 (Tex. 2000) and *Harris County v. Smith*, 96 S.W.3d 230 (Tex. 2002). *See Romero*, 166 S.W.3d at 226 (recognizing that in certain cases broad from submission is not appropriate, e.g., invalid theories of liability or damages submitted with valid theories of liability in a single broad form question). As recognized by the supreme court, broad form submission must be used unless extraordinary circumstances exist. *Tex. Dep't of Human*

*Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990). Second, the malicious prosecution charge given to the jury was the long-standing charge contained in the Texas Pattern Jury Charge. *See* STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES–GENERAL NEGLIGENCE, INTENTIONAL PERSONAL TORTS, PJC 6.4 (2010). Although the Texas Pattern Jury Charges are a guide and not binding on the court, well-settled pattern jury charges should not be embellished with addendum. *H.E. Butt Grocery Co. v. Bilotto*, 928 S.W.2d 197, 201 (Tex. 1996); *Weeks Marine, Inc. v. Salinas*, 225 S.W.3d 311, 319 (Tex. App.—San Antonio 2007, pet. dism'd). Marin has not argued the current jury charge is insufficient.

Moreover, Marin did not object based on the absence of an issue, instruction, or definition of "innocence," nor did it submit in writing a substantially correct issue, instruction, or definition. Thus, Marin has waived any complaint. *See* TEX. R. CIV. P. 274 (requiring party objecting to charge to point out distinctly objectionable matter and grounds for objection; in absence of proper objection, error is waived); *see also Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43 (Tex. 2007) (recognizing requirements of Rule 274); *Sears Roebuck & Co. v. Abell*, 157 S.W.3d 886, 892 (Tex. App.—El Paso 2005 pet. denied) (holding Rule 274 is to be strictly construed, requiring objections to jury charge to specify error and legal basis of objection). Accordingly, Marin's complaint is overruled.

### 3. Probable Cause

Marin next challenges the sufficiency of the evidence on the element of probable cause. Marin correctly points out that a malicious prosecution case begins with the presumption that the defendant acted reasonably and had probable cause to initiate the prosecution. *See Suberu*, 216 S.W.3d at 793. However, the plaintiff can rebut this presumption by producing evidence that the motives, grounds, beliefs, or other information upon which the defendant acted did not constitute

probable cause. *Id.* Marin contends the Vogts failed to produce evidence to rebut the presumption that Marin had probable cause to report Mr. Vogt for the offense of criminal mischief. Marin also points out that when it reasonably appears to a citizen that a crime has been committed, the citizen has no duty before filing charges to inquire as to whether the suspect might have had an alibi or explanation for his action. *See id.* at 794; *First Valley Bank v. Martin*, 144 S.W.3d 466, 470 (Tex. 2004).

Marin is correct regarding the presumption and the absence of duty to inquire as to why the person against whom charges are filed acted as he did. However, the Vogts counter that the record is replete with evidence they produced showing Marin filed charges against Mr. Vogt not because they sincerely believed he had committed criminal mischief, but because Marin and Trada Partners, through their agents, were doing anything and everything in their power to intimidate the Vogts into giving up their easement and to gain an advantage against the Vogts in the civil suit. Thus, according to the Vogts, they rebutted the presumption, the burden shifted to Marin to establish probable cause, and the issue became one for the jury. *See Thrift v. Hubbard*, 974 S.W.2d 70, 79 (Tex. App.—San Antonio 1998, pet. denied).

The Vogts point to evidence showing: (1) Sieckert's hostility toward the Vogts–"If you think . . . we're going to change our plans because you say that's your easement . . . you're greatly mistaken."; (2) Sieckert's increasing frustration with the Vogts' refusal to give up the easement, e.g., Sieckert's statement to Pape-Dawson Construction about the Vogts' complaints and attempts to stop the development; (3) intimidation of a contractor who planned to assist the Vogts in clearing the easement; (4) Sieckert's knowledge from the outset that the Vogts owned the easement; (5) the Rule 11 agreement, memorializing the Vogts' rights to use and maintain the

easement; and (6) the provision of false evidence to authorities by Sieckert and counsel for Trada Partners and Marin during the criminal mischief investigation.

This is certainly some evidence rebutting the presumption that Marin filed charges against Mr. Vogt simply because he cut some fencing and spray painted sidewalks and air conditioning units belonging to Trada Partners and Marin. The jury could have believed filing charges was the culmination of a campaign by Trada Partners and Marin to wrest the easement from the Vogts by whatever means possible. *See, e.g., Thrift*, 974 S.W.2d at 79-80 (holding jury could have found defendant filed criminal complaint "to gain an advantage in the civil litigation stemming from these same facts."). And although we recognize a person has no duty to investigate if there was some reason to justify an accused's action, Marin had no need to investigate in this case because it knew Mr. Vogt was simply doing what he had been trying to do all along–retain the use of his easement and maintain it for use as permitted under the Rule 11 agreement. *See Suberu*, 216 S.W.3d at 794; *Martin*, 144 S.W.3d at 470.

Marin did not present any testimony to establish probable cause once the Vogts presented evidence rebutting the presumption. In fact, the only evidence presented by Marin was the testimony of a single property owner who testified she did not design or develop anything, but simply purchased the property as an investment. Accordingly, we hold there was evidence from which the jury could have found an absence of probable cause.

*4. Malice*

Finally, Marin contends there was no evidence or insufficient evidence of malice by Marin. Marin argues that because it had a legal right to report Mr. Vogt's vandalism, there can be no finding of malice. *See Closs v. Goose Creek Consol. Indep. Sch. Dist.*, 874 S.W.2d 859, 878 (Tex. App.—Texarkana 1994, no writ) (holding that summary judgment evidence

established ranger with DPS did not act with malice because he was "charged with the duty to investigate reported criminal activity" and averred his actions were not undertaken for improper purpose but only in capacity as ranger).

A person acts with malice in a malicious prosecution case when he acts with ill will or evil motive to the injury of another, or acts in reckless disregard of the rights of another and with indifference as to whether the other person is injured so as to amount to wanton and willful action knowingly and unreasonably done. *Id.* Malice can be established by either direct or circumstantial evidence and may be inferred from a lack of probable cause. *Thrift*, 974 S.W.2d at 80.

Of course a person has the legal right to report a crime. *See Closs*, 874 S.W.2d at 878. However, if a person reports a crime with an improper purpose, or in reckless disregard of the rights of another in a knowing and unreasonable manner, that is malice. *Id*. With regard to this case, given the evidence that Marin lacked probable cause to report Mr. Vogt, and that it acted to intimidate the Vogts or gain an advantage in the civil suit, the jury could have inferred Marin acted with "ill will or evil motive." Moreover, malice is shown by the false statements provided to investigators by Sieckert and counsel for Trada Partners and Marin regarding Mr. Vogt's prior actions and the status of the Vogts' rights to the easement, as well as their failure to disclose the existence of the Rule 11 agreement and the Vogts' rights thereunder when first questioned by the investigator. *See, e.g., Richey*, 952 S.W.2d at 519-20 (holding that in malicious prosecution action, failing to fully and fairly disclose all relevant facts or knowingly providing false information to police is relevant to malicious intent of defendant); *Thrift*, 974 S.W.2d at 80 (holding defendant's failure to disclose exculpatory facts was sufficient to demonstrate malice).

Based on the standards of review, the applicable law, and the evidence, we hold there was sufficient evidence, which the jury could have credited and believed, to sustain the Vogts' claim for malicious prosecution. As previously noted, jurors are the sole judges of the credibility of the witnesses and the weight to be given their testimony, and may believe one witness and not another. *City of Keller*, 168 S.W.3d at 819.

### *Effect of Default Judgment Against Trada*

As noted above, when the trial court called the case for trial on May 5, 2009, Trada Partners, which had filed an answer, failed to appear. The case proceeded to trial and verdict without Trada Partners. Thereafter, on October 12, 2009, the trial court entered a default judgment against Trada Partners and in favor of the Vogts. The default judgment recites that it "disposes of all issues and claims as between John E. Vogt and Nelda L. Vogt and Trada Partners VI, LP." The judgment further states that it is severed, but failed to assign a separate docket number.

Marin suggests, in its ninth issue, that the rendition of the default judgment against Trada Partners and the subsequent rendition of a separate judgment disposing of the Vogts' claims against Marin violates the "one judgment rule" contained in Rule 301 of the Texas Rules of Civil Procedure. In support of its contention, Marin argues the default judgment was a final judgment, and given the absence of a severance, the subsequent rendition of judgment against Marin was prohibited by Rule 301.

First, there is nothing in the record showing Marin raised this issue in the trial court. Although we have found no cases specifically holding that a complaint involving violation of the "one judgment rule" requires an objection in the trial court before it can be asserted on appeal, Rule 33.1(a) of the Texas Rules of Appellate Procedure states that before a complaint can be

presented for appellate review, the record must show the complaint was presented to the trial court by "timely request, objection, or motion" that states the ground for the ruling sought with sufficient specificity to make the trial court aware of the complaint, and the trial court ruled. TEX. R. APP. P. 33.1(a). The only exceptions to the preservation requirement of Rule 33.1(a) in civil cases are rare instances of "fundamental error," which the supreme court has held includes cases in which the face of the record shows the court lacked jurisdiction or in certain types of error in juvenile delinquency cases. *In re B.L.D.*, 113 S.W.3d 340, 350 (Tex. 2003). Even constitutional error can be waived if not raised in the trial court. *See In re L.M.I.*, 119 S.W.3d 707, 711 (Tex. 2003); *City of San Antonio v. Schautteet*, 706 S.W.2d 103, 104 (Tex. 1986) (per curiam). Given Marin's failure to bring this issue to the attention of the trial court, any error is waived. However, even if Marin had not waived this issue, it has no substantive merit.

Substantively, Marin contends there was no severance in this case, making the October 12, 2009 default judgment the "sole final judgment," and thereby precluding the subsequent judgment rendered in April 2010 against Marin. Marin is incorrect.

When the trial court rendered the default judgment against Trada Partners, it specifically stated in the judgment that the judgment against Trada Partners "is hereby severed from this cause." Marin seems to contend this was not effective to sever the Vogts' claims against Trada Partners from the remainder of the suit because: (1) there was no separate severance order, or the language in the judgment was somehow conditional; and (2) the trial court failed to include a docket number in the judgment for the severed cause, rendering the severance ineffective.

First, Marin has cited no authority for the proposition that a severance must be contained in an order separate from the judgment. There is nothing in Texas law to prohibit a trial court from including a severance order within the judgment to be severed–in fact, this is quite

common. Moreover, the language in the trial court's order was not conditional; rather, the court specifically ordered the judgment against Trada Partners severed from the Vogts' claims against the remaining defendants. Accordingly, the severance was not ineffective for either of these reasons.

Nor is the severance ineffective because it failed to assign a docket number to the severed cause. Although the judgment stated it was assigned a new docket number, the blank for the new docket number was not filled in, i.e., no new docket number was assigned to the severed cause. The supreme court has held the granting of a severance is effective when signed. *McRoberts v. Ryals*, 863 S.W.2d 450, 452-53 (Tex. 1993); *Finlan v. Peavy*, 205 S.W.3d 647, 651 (Tex. App.—Waco 2006, no pet.). The severance becomes effective without the district clerk's assignment of a new docket number and without the creation of a separate physical file. *Id.* Moreover, the severance is effective immediately whether or not the clerk ever creates a physically separate file or assigns a new number to it. *Id.* Accordingly, the severance was not ineffective for the trial court's failure to assign a separate docket number to the severed cause. *See id.*

Therefore, contrary to Marin's assertions, there was an effective severance. The question then becomes, what effect does an effective severance have on Marin's "one judgment rule" argument? The answer: it defeats it.

A severance divides a lawsuit into two or more separate and independent causes that may be resolved separately. *In re Liu*, 290 S.W.3d 550, 519-20 (Tex. App.—Texarkana 2009, no pet.) (citing *Hall v. City of Austin*, 450 S.W.2d 836, 837-38 (Tex. 1970)). When a severance is granted, the separated causes proceed to individual judgments–judgments that are separately final and appealable. *Liu*, 290 S.W.3d at 520 (citing *Hall*, 450 S.W.2d at 838); *see Van Dyke v. Boswell, O'Toole, Davis & Pickering*, 697 S.W.2d 381, 383 (Tex. 1985). In other words, after a

severance, there are two separate causes resulting in two separate judgments. Accordingly, the "one judgment rule," which states "one final judgment shall be rendered in any cause" is not implicated because there are two causes with separate judgments.

Because there was an effective severance, the "one judgment rule" is not implicated, and therefore Marin's argument is without merit and the issue is overruled.

## CONCLUSION

Based on the foregoing, we overrule all of Marin's issues and affirm the trial court's judgment in favor of the Vogts.

Marialyn Barnard, Justice