**Opinion issued January 19, 2023**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00352-CV

————————————

**JONATHAN B. BERRYHILL, Appellant**

**V.**

**MICHELLE LEIGH BERRYHILL, Appellee**

---

**On Appeal from the 300th District Court**
**Brazoria County, Texas**
**Trial Court Case No. 109759-F**

---

## MEMORANDUM OPINION

Appellant, Jonathan B. Berryhill, challenges the trial court's post-answer default judgment in favor of appellee, Michelle Leigh Berryhill, in Michelle's countersuit for divorce. In his sole issue, Jonathan contends that the trial court erred in denying his motion for new trial.

We affirm.

## Background

In her first amended counterpetition for divorce, Michelle alleged that she and Jonathan were married on May 8, 2009 and they ceased living together as spouses on September 6, 2020. According to Michelle, the marriage had "become insupportable because of discord or conflict of personalities between [Michelle] and [Jonathan]," Jonathan was "guilty of cruel treatment toward [Michelle] of a nature that render[ed] further living together insupportable," and Jonathan had "committed adultery."

Michelle further alleged that she and Jonathan had two minor children (the "children") and appointing Michelle and Jonathan as the children's joint managing conservators would not be in the children's best interest. According to Michelle, Jonathan had "a history or pattern of committing family violence," and an order for emergency protection had been entered against Jonathan. Michelle requested that she be appointed as the children's sole managing conservator and that the trial court deny Jonathan access to the children. Michelle also requested that Jonathan be ordered to provide support for the children, including child support and medical and dental support.

As to the division of the marital estate, Michelle requested that she be "awarded a disproportionate share of the parties' estate," for numerous reasons,

2

including Jonathan's "fault in the breakup of the marriage" and "actual fraud committed by" Jonathan.

Jonathan answered, generally denying the allegations in Michelle's first amended counterpetition for divorce.

On October 18, 2021, Jonathan's then-attorney filed a motion to withdraw, requesting that the trial court "discharge [him] as [the] attorney of record" for Jonathan because he and Jonathan could not "agree on strategy." Jonathan signed the motion to withdraw, affirming that he "approved and consented" to the motion. (Emphasis omitted.) On October 20, 2021, the trial court granted the motion to withdraw and discharged Jonathan's then-attorney as the attorney of record for Jonathan. The trial court ordered that "all future correspondence in th[e] [case] . . . go directly to Jonathan" at his personal email address. The trial court listed Jonathan's personal email address in the order. Jonathan signed the order, affirming that he agreed to its form and substance.

On January 25, 2022, the trial court signed a scheduling order and notice of intent to dismiss, setting the case for trial on March 10, 2022. On March 10, 2022, the case was called to trial, and Michelle appeared and announced ready. Jonathan did not appear.

At trial on Michelle's first amended counterpetition for divorce, Michelle testified that she and Jonathan were married on May 8, 2009 and they separated

3

around September 6, 2020. According to Michelle, the marriage "bec[a]me insupportable because of discord or conflict in personalities that destroy[ed] the legitimate ends of the marriage relationship" and Jonathan had been "guilty of cruel treatment" and had committed adultery. Michelle and Jonathan were the parents of the children.

Michelle stated that she was requesting to be named the children's sole managing conservator and for Jonathan to be named the children's possessory conservator. Mother also asked that Jonathan be denied visitation or access to the children, or if Jonathan was permitted to have visitation with the children, that it be supervised. According to Michelle, Jonathan last saw the children in November 2020, and Jonathan had "anger issues," "a history of drug abuse," and a "history of . . . physical abuse." Jonathan had been physically abusive to Michelle; he hit her numerous times and "beat" her in front of the children. Jonathan had also "hit [Michelle and Jonathan's son] in the head[] . . . a lot."

Jonathan had threatened Michelle, and she was scared of him. Jonathan told Michelle that "if he didn't get the [children] then nobody could get the [children]" and "if he couldn't have [her], nobody could have [her]." Jonathan "threatened to lock [Michelle] out of the house and . . . take everything from [her]." He "threatened to take the [children] from [her]." Michelle took Jonathan's threats seriously

4

because he had "injured [her] in the past." Michelle and Jonathan's son, who had been hit by Jonathan, was also "fearful of" him.

Michelle further testified that Jonathan had been charged with the offenses of "[a]ssault [c]auses [b]odily [i]njury" and retaliation and she "had a [p]rotective [o]rder" against him. Jonathan warned Michelle that if she did not "recant the things that [she had] said about [his criminal] charges, . . . it was going to end badly for [her]." Jonathan had also sent Michelle emails in which he was "very disrespectful and ugly" to her, and she did not believe that they could make decisions together for the children, which was why she was asking to be named the children's sole managing conservator. Michelle believed that it was in the best interest of the children for her to be named as their sole managing conservator.

As to child support, Michelle testified that since their separation in September 2020, Michelle had received $1,000 from Jonathan. When Michelle and Jonathan were together, Jonathan earned about "$40 an hour," which, according to Michelle, was what Jonathan was earning at the time of trial. Michelle requested that the trial court "calculate child support [based on] 40 hours a week, $40 an hour" or set $1,365 a month as Jonathan's child support obligation. Michelle also requested retroactive

5

child support back to November 1, 2020. In other words, Michelle asked "for a judgment for back-due child support of $21,840" against Jonathan.[1]

The trial court admitted into evidence a copy of an email from Michelle's attorney to Jonathan at his personal email address. The email, dated January 25, 2022, included, as an attachment, the trial court's January 25, 2022 scheduling order, setting the case for trial on March 10, 2022. The body of the email informed Jonathan that the "trial date [was] set for March 10, 2022 at 9:00 a.m." and said, "we will see you then."

At the conclusion of trial, the trial court found Michelle and Jonathan's marriage to be "insupportable because of discord or conflict of personalities" and it also found "fault grounds of cruel treatment." The trial court granted a divorce.

As to the children, the trial court found that it was not in their best interest for Michelle and Jonathan to be named as joint managing conservators, and consistent with that finding, the trial court appointed Michelle as the children's sole managing conservator and Jonathan as the children's possessory conservator. The trial court also found that it would not be in the children's best interest for Jonathan to have

---

[1] Michelle also testified regarding her proposed property division, and the trial court admitted into evidence a document titled: "The Inventory and Appraisement of Michelle . . . Wife's Proposed Division and Award of Property Belonging to the Parties." (Emphasis omitted.)

"any visitation or access to the children." And the trial court found that its orders were in the children's best interest.

As to Jonathan's child-support obligation, the trial court ordered Jonathan to pay $1,365 each month beginning on April 1, 2022, and it ordered Jonathan to continue to provide health insurance coverage for the children. The trial court granted Michelle's request for retroactive child support in the amount of $21,840. The trial court found that its orders were in the children's best interest.[2]

On April 8, 2022, Jonathan filed a Motion to Set Aside Rendition and Motion for New Trial, stating that the trial court had rendered judgment against him on March 10, 2022 when he failed to appear at trial. Jonathan asserted that his failure to appear at trial was not intentional or the result of conscience indifference but was due to a mistake or accident because he believed that trial was set on March 11, 2022 and he had marked that date in his cellular telephone's calendar application. Jonathan did not discover his mistake until he went to the courthouse on March 11, 2022.

Jonathan also asserted that he had a meritorious defense to Michelle's claims against him, namely that the "child support identified [by the trial court] exceed[ed] the amount allowed under the [Texas] Family Code." According to Jonathan, he

---

[2] The trial court also found that Michelle's requested property division was a "fair and equitable division," and it accepted her "request for a division of property as set out in [her] exhibit[]."

was unemployed and had been unemployed "for long periods of time since 2019." Jonathan also no longer had health insurance to provide for the children.

Further, Jonathan asserted that he had a meritorious defense to Michelle's claims against him because the trial court's visitation ruling was "contrary to the [Texas] Family Code" as there was a "presumption that a standard visitation order [was] in the best interest of the children." And he should have at least a "standard visitation order" related to the children.

According to Jonathan, granting his motion would not delay or otherwise cause an injury to Michelle or the children because "a new trial w[ould] result in an order concerning health insurance and child support which Jonathan [was] capable of complying with."

Jonathan attached his declaration to his Motion to Set Aside Rendition and Motion for New Trial, in which he stated:

> I am a litigant in the [instant] case. I was previously represented by an attorney, but he withdrew in October of 2021. After my attorney withdrew, the Court entered a scheduling order in this case and set the matter for trial on March 10, 2022. I erroneously believed the trial was set for March 11, 2022. I use the calendar app on my iPhone to keep track of dates and I listed March 11, 2022 as the trial date in the app. I recall entering the trial date into my phone because it coincide[d] with my [and Michelle's] son['s] . . . birthday, which [was] also March 11 . . . .
>
> On March 11, 2022, I prepared for the trial, put on a shirt and tie, and drove from my residence in League City to Angleton. I attempted to park between the annex and the courthouse, but the parking lot was full, so I instead parked in the new parking lot behind the courthouse.

8

After parking, I looked up my case online to see which courtroom the hearing would be in. When I looked up the case, I realized that it was in fact set for trial on March 10. Before looking up the case, I had not realized that I had the wrong date.

When I realized that I'd missed my court date, I went into the [d]istrict [c]lerk's office to see what I could do to correct the situation. I searched for the judgment on the clerk's computer. Ronda Allison, the deputy district clerk, emailed me a copy of the judicial docket sheet and scheduling order at 11:09 a.m. that day. The judicial docket sheet contained notes granting the divorce, ordering that I have no contact or access to my two children, ordering me to carry insurance for the children at my cost, ordering me to pay retroactive child support in the amount of $21,840 at a rate of $200 per month, and ordering me to pay continuing child support at $1[,]365 per month.

After seeing the judgment, I attempted to determine how to proceed. I called friends, lawyers, and the clerk's office looking for advice. I thought that my only option was to file an appeal, so I did so. I printed a pre-written document styled "Notice of Appeal" and filled it in by hand. I filed the notice of appeal in the afternoon on March 11. I did not realize I could file a motion to set aside the default judgment until conferring with my current counsel on April 6, 2022.

I am currently unemployed and therefore have no employer[-]provided health insurance. I was unemployed for almost all of 2019. In 2019, I drove a tow truck intermittently and was paid separately for each tow. Between January of 2020 and November of 2020, I worked for Anheuser-Busch and made $32 per hour before taxes. I was unemployed from November of 2020 until July or August of 2021. Between July or August of 2021 and February of 2022, I worked for Polymer Chemistry in Alvin, Texas and made $40 per hour before taxes. I have been unemployed since the beginning of February of 2022.

I have attached true and correct copies of my tax return for the years 2019, 2020, and 2021. In 2019, I made $9,372 in wages and collected $13,182 in unemployment. In 2020, I made $56,321 in wages. In 2021, I made $49,027 in wages. In 2022, I have made approximately $6,400. I lost my job at the beginning of February and

have not worked since. I am currently looking for a job. The backpay for child support is more than the [Texas] Family Code authorizes for the amount of income I have made since 2019.

I do not have enough savings to pay the required child support while I am unemployed. I do not currently have health insurance. I currently have $3,000 in my bank account. My mortgage is approximately $1,300 per month and my house is currently in foreclosure because I am approximately $20,000 in arrears.

The [trial] [c]ourt's order also states that I am to have no contact or access to my children. I love my children very much and I have not been allowed to see them in person since approximately October of 2020. I filed multiple motions attempting to gain access to my children, but my lawyer was unable to get a hearing because of the Covid-19 pandemic. Since October of 2020, Michelle has only allowed me to see the children over video calls.

My [and Michelle's] son . . . was born in 2010. [Our] daughter . . . was born in 2018. Prior to my current divorce, I was always [the] children's primary caretaker. I made them breakfast every morning, dinner every night, and took them to school every day. I took [the] children to all of their doctor's appointments. I took [the] children to after school functions and sports. [Our son] played basketball and attended boy scouts. [Our daughter was] not old enough to do after school activities, but I frequently took her with me to the grocery store or on other errands. I also took both [of the] children out on the boat and to parks. All of my time was devoted to [the] children when I was unemployed.

After Michelle and I separated for the first time in 2015, we agreed to share custody of [our son] and swap each week. Michelle frequently called me to ask me to take [our son] during her week. When Michelle and I reconciled in 2016, I resumed my role as [our son's] primary caretaker. I was also the primary caretaker to [our daughter], after she was born. Michelle . . . frequently took care of only one child because she was overwhelmed by caring for both [of the] children simultaneously. Michelle found caring for [our daughter] particularly overwhelming. I was the only parent who was able to get [her] to sleep at night.

I have never been abusive or violent toward Michelle or the children. I have never used drugs in front of the children. I have never consumed alcohol to excess in front of the children. I understand that Michelle has filed police reports saying I am abusive, but they are not true. There is only one [Child Protective Services ("CPS")] report which I am aware of. I called CPS in 2015, while we were separated, because Michelle was leaving [our] son with strangers in the house while she was not home. Michelle has been violent toward the children. She has thrown them out the door and against a wall. [Our] daughter has difficulty falling asleep, and Michelle has become frustrated and thrown [our] daughter at me. On one occasion, she threatened me with a screwdriver.

The Court's order is contrary to the [Texas] Family Code because there is a presumption that a standard visitation order is in the best interest of the children. Based on my history with the children, the standard visitation order is the minimum I should have.

On May 5, 2022, the trial court signed a default final divorce decree, which appointed Michelle as the children's sole managing conservator and Jonathan as the children's possessory conservator. The trial court also ordered that Jonathan "have no possession of or access to the children." As to child support, the trial court ordered Jonathan to "pay retroactive child support in the amount of $21,840[] for the time period [from] November 1, 2020 through March 1, 2022" and rendered judgment against Jonathan in the amount of $21,840. Further, the trial court ordered Jonathan to pay $1,365 per month as his child support obligation beginning on April 1, 2022.[3]

---

[3] The trial court's default final divorce decree also included a division of Michelle and Jonathan's property.

Michelle then filed a response to Jonathan's Motion to Set Aside Rendition and Motion for New Trial, asserting that Jonathan had "numerous notices of the [trial] date for the final trial," including in correspondence from Michelle's trial counsel. According to Michelle, Jonathan did not have a meritorious defense because "he [had] failed to provide responses to discovery [requests that were] tendered to him on 12/2/2020." The requests concerned his employment, income, child support, conservatorship, and division of property and debt, and because no responses were ever received, any evidence and testimony that Jonathan might have offered on those issues would have been excluded at trial. Michelle further asserted that any delay caused by the granting of Jonathan's motion would injure her and the children.[4] Michelle attached to her response a copy of the discovery requests that she had sent to Jonathan on December 2, 2020.

On June 3, 2022, Jonathan filed another motion for new trial, which was nearly identical to his previously filed Motion to Set Aside Rendition and Motion for New Trial.[5] Jonathan attached his same declaration to his June 3, 2022 motion for new trial.

---

[4]   Mother also objected to Jonathan's declaration.

[5]   In addition to the arguments previously asserted in his Motion to Set Aside Rendition and Motion for New Trial, Jonathan, in his June 3, 2022 motion for new trial, asserted that he had "a meritorious defense as to the [trial court's] property division because he paid the entire mortgage on the house for thirteen years" and Michelle had "failed to pay the mortgage and the house ha[d] gone into foreclosure."

At the hearing on Jonathan's motion for new trial, Jonathan testified that he believed that trial was set in the instant case on March 11, 2022 because that was his and Michelle's son's birthday and he "put the court date in [his] calendar on [the] son's birthday." He "put it in . . . the calendar wrong." On the morning of March 11, 2022, Jonathan "c[a]me to court[] and realized that the court date wasn't . . . on March 11th." When he arrived at the courthouse, he "looked to see what courtroom [he] needed to be in" using the Brazoria County court website. That was "the first time that [he] realized that trial was set on March 10th, not March 11th." He then "came into the courthouse" and "went to the district clerk and started printing paperwork, getting on the Internet, finding out what [he] could do to change the outcome." A copy of the trial court's docket sheet was emailed to him, which said that a default judgment had been ordered. Jonathan "called friends and attorneys to try to figure out what [he] needed to do." Jonathan "went to the law library . . . [in] the courthouse[] and . . . printed [out a document titled Notice of Appeal] and filled it out to the best of [his] knowledge." He then filed the notice of appeal with the district clerk's office on March 11, 2022. At the time, he was not aware that he could file a motion for new trial.

Jonathan further testified that at the time of the motion-for-new-trial-hearing, he was employed by Allegiant, but he did not currently have employer-provided health insurance. He had been working at Allegiant for three weeks and earned $32

13

an hour.[6]  He stated that he would qualify for employer-provided health insurance after being employed for sixty days.  In 2019, Jonathan drove a tow truck for about six months.  When he was driving a tow truck, he was paid "[b]y [the] tow."  He would receive a weekly paycheck, but the amount depended on his workload.  The remainder of 2019 Jonathan was unemployed, and he stayed at home "to be with the family" and "help raise [the children]."  From January 2020 to November 2020, Jonathan worked at Anheuser-Busch and was paid $32 per hour.  Jonathan was unemployed from November 2020 to August 2021.  From August 2021 to February 2022, Jonathan worked at Polymer Chemistry and was paid $40 per hour.  He became unemployed at the beginning of February 2022.  According to Jonathan, he earned less than $20,000 in 2019.  In 2020, he earned about $60,000 or $70,000, and in 2021, he earned about $60,000.  In 2022, he had earned about $5,000 or $10,000 so far.

Jonathan testified that Michelle had never paid the mortgage on their house and if he was unemployed "[n]o one" made any mortgage payments.  Jonathan stopped paying the mortgage on the house because he was "wrongfully put in jail."

---

[6]  Jonathan also testified that he was hired by Allegiant about six weeks or eight weeks before the hearing on his motion for new trial and was then "laid off" about "four weeks ago."  He stated that he was "laid off for the last three weeks," but also stated that he was "working at Allegiant" again at the time of the hearing.

As to the children, Jonathan testified that his and Michelle's son was born in 2010 and their daughter was born in 2018. The last time that Jonathan saw the children in person was October 31, 2020. He had occasionally had video calls with the children, which had happened "a handful of times a year." Before the divorce, Jonathan stated that he was the children's primary caretaker. He made breakfast for the children "[m]ost of the time," and made dinner for them "[w]hen [he] was home." He took his and Michelle's son to school every day and took him to his activities like basketball and the Boys Scouts of America. During the day, his and Michelle's daughter, who was not school-aged, went everywhere with Jonathan; he took her to the store, and they played outside. He took the children to doctor's appointments. According to Jonathan, his and Michelle's son had missed thirty-two days of school during the 2021–2022 school year, and Michelle told him it was because of "lice, flu-like symptoms, [and] COVID two or three times."

Jonathan also testified that at some point, before his and Michelle's most recent separation in 2020, their daughter had a hard time going to sleep and Michelle could not get her to sleep. Jonathan would comfort their daughter, play with her, make her laugh, and put her to sleep.

Jonathan further stated that during their previous separation in 2015, he and Michelle had joint custody of their son on a week-to-week basis. But Michelle would not keep their son for the entire week. In 2015, Jonathan called CPS because

he was worried about their son being with Michelle considering "Michelle's medical conditions, having seizures and blackouts."

According to Jonathan, he had never used narcotics or been intoxicated from alcohol in front of the children. He had never been abusive to Michelle or to the children. Michelle, though, had been violent with the children and violent toward him. Michelle threw their daughter and would "hit[], scream[], yell[], and cu[rse]." And Michelle had threatened Jonathan.

On cross-examination, Jonathan testified that he and Michelle were married on May 8, 2009 and they separated in September 2020. He had not seen the children since October 2020 but noted that Michelle had allowed him to communicate with the children electronically. He was concerned with Michelle's ability to care for the children. However, he noted that after he called CPS in 2015, his and Michelle's son was not taken away from Michelle.

Jonathan explained that he had three pending criminal charges against him. One pending criminal charge was for "[f]amily violence" against Michelle, in which it was alleged that he had struck her. He went "to jail on that case" for one day, and he "filed for divorce after that happened." He then went to stay at a friend's house because there was "a [p]rotective [o]rder against [him]." He also had a pending criminal charge for violation of the protective order, and he went to jail for one day related to that offense. Finally, he had a pending criminal charge for retaliation.

Since October 2020, he had been incarcerated three times. The third time that he went to jail it was for three months, which he agreed was likely related to a violation of the protective order, possession of a controlled substance, and stalking.

Jonathan also testified that he was previously represented by two different attorneys in the trial court, and he did not recall being served with discovery requests. Jonathan never provided a property inventory when he was represented by trial counsel or when he was proceeding pro se. According to Jonathan, he was not able to answer the discovery requests because he was incarcerated. Jonathan believed that he was incarcerated from December 2020 to March 2021.

Jonathan noted that at the time of the hearing on his motion for new trial, he was still living in the house, and he stated that he did not believe that Michelle should be paying the mortgage for the house while he was still living there. Despite the trial court's default final divorce decree, which awarded Michelle possession of the house, Jonathan had not moved out. Jonathan had lived in the house until he went to jail in 2020. He moved back into the house at the end of February 2022. He had been paying the mortgage every month since moving back into the house.

As to child support, Jonathan stated that, although he was ordered to pay child support in the trial court's default final divorce decree, he had not paid child support because he had not "set [it] up" with the Attorney General's office. He stated that he had given Michelle money, but he did not know how much he had given to

Michelle. And he had not "given Michelle money in a while." The money he had previously given her was pursuant to either temporary orders or no orders, but he had not given Michelle any child support as ordered by the trial court in its default final divorce decree.

As to his failure to appear at trial, Jonathan admitted that Michelle had sent him a text message with the trial date. The trial court admitted into evidence a copy of text messages between Michelle and Jonathan, on March 3, 2022, in which Michelle told Jonathan that they were scheduled for trial on Thursday, March 10, 2022.

At the end of the hearing, the trial court found that, under *Craddock v. Sunshine Bus Lines Inc.*, 133 S.W.2d 124 (Tex. 1939), "the result of [Jonathan's] nonappearance was a conscious indifference because [Jonathan's] testimony clearly [was] that he received a text [message] from [Michelle] of the date of trial being on that Thursday. He had multiple communication[s] during those text[] [messages], which [were] admitted." The trial court also found that Jonathan had "not set up a meritorious defense with regard to the custody issues" because "[t]here was a [p]rotective [o]rder in place, which t[ook] away all of the presumptions with regard to visitation and joint managing conservatorship." And as to "delay," the trial court found that "there[] [was] absolutely a delay to grant [Jonathan's] motion and [that]

18

would certainly work an injury to [Michelle] . . . and to the children to . . . go back." The trial court denied Jonathan's motion for new trial.

## Standard of Review

We review the trial court's denial of a motion for new trial for an abuse of discretion. *See Dolgencorp of Tex., Inc. v. Lerma*, 288 S.W.3d 922, 926 (Tex. 2009); *In re R.R.*, 209 S.W.3d 112, 114 (Tex. 2006). In other words, the trial court's ruling on the motion will not be disturbed on appeal absent a showing of an abuse of discretion. *Strackbein v. Prewitt*, 671 S.W.2d 37, 38 (Tex. 1984). A trial court abuses its discretion if its decision is arbitrary, unreasonable, and without reference to guiding rules and principles. *See Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex. 1997); *Imkie v. Methodist Hosp.*, 326 S.W.3d 339, 344 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

## Motion for New Trial

In his sole issue, Jonathan argues that the trial court erred in denying his motion for new trial because he "appeared for trial one day late" as he had "miscalendared" the date of trial and he had a meritorious defense as "he should have been made a joint managing conservator with a standard visitation order" and he was unemployed.

A post-answer default judgment is permissible when a party files an answer in the case, but the party fails to appear for trial. *See Stoner v. Thompson*, 578

S.W.2d 679, 682 (Tex. 1979); *Estate of Rivers*, No. 01-17-00879-CV, 2018 WL 4354351, at *2 (Tex. App.—Houston [1st Dist.] Sept. 13, 2018, no pet.) (mem. op.). A post-answer default judgment is valid only if the defaulting party received adequate notice of the trial setting. *See Parsons v. Parsons*, No. 01-18-00902-CV, 2019 WL 5382637, at *2 (Tex. App.—Houston [1st Dist.] Oct. 22, 2019, no pet.) (mem. op.); *In re $475,001.16*, 96 S.W.3d 625, 627 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *see also* TEX. R. CIV. P. 245.

If a party answers a lawsuit, receives proper notice of the trial setting,[7] and fails to appear for trial, and the trial court grants a post-answer default judgment, the party may move for a new trial, which should be granted, if he establishes all three of the *Craddock*[8] prongs: (1) his nonappearance was the result of an accident or mistake and was not intentional or the result of conscious indifference; (2) the motion for new trial alleged a meritorious defense; and (3) granting the motion for new trial would not cause undue delay or otherwise injure the non-movant. *See Dolgencorp*, 288 S.W.3d at 925–26; *Parsons*, 2019 WL 5382637, at *2; *Maxx Builders, LLC v. Story*, No. 01-15-00850-CV, 2016 WL 3544495, at *3 (Tex. App.—Houston [1st Dist.] June 28, 2016, no pet.) (mem. op.).

---

7    Jonathan does not assert that he did not receive notice of the March 10, 2022 trial setting.

8    *Craddock v. Sunshine Bus Lines Inc.*, 133 S.W.2d 124, 126 (Tex. 1939).

In his briefing, Jonathan argues that the trial court erred in denying his motion for new trial because he "explained in his . . . declaration that he appeared for trial one day late because he miscalendared the trial date" and thus he "met his burden to negate intent and conscious indifference." Jonathan also argues that the trial court erred in denying his motion for new trial because he had a meritorious defense. According to Jonathan, "[h]is declaration present[ed] facts that show that he should have been made a joint managing conservator with a standard visitation order or possible [sic] been given the right to select the residence of the children, and at least should have been given some access to the children," and his declaration established that he was unemployed and had "serious financial problems," which was a meritorious defense to "the financial aspects of the default judgment." (Emphasis omitted.) But Jonathan does not make any argument about or provide any analysis related to the third prong of *Craddock*, i.e., that the granting of Jonathan's motion for new trial would not cause undue delay or otherwise injure Michelle. *See Dolgencorp*, 288 S.W.3d at 925–26; *Craddock*, 133 S.W.2d at 126.

"An appellate brief is meant to acquaint the court with the issues in a case and to present argument that will enable the court to decide the case." *Schied v. Merritt*, No. 01-15-00466-CV, 2016 WL 3751619, at *2 (Tex. App.—Houston [1st Dist.] July 12, 2016, no pet.) (mem. op.) (internal quotations omitted). The Texas Rules of Appellate Procedure control the required contents and organization of an

appellant's brief. *Id.*; *see* TEX. R. APP. P. 38.1. The appellate briefing requirements are mandatory. *M&E Endeavors LLC v. Air Voice Wireless LLC*, Nos. 01-18-00852-CV, 01-19-00180-CV, 2020 WL 5047902, at \*7 (Tex. App.—Houston [1st Dist.] Aug. 17, 2020, no pet.) (mem. op.). "Only when [an appellate court is] provided with proper briefing may [it] discharge [its] responsibility to review the appeal and make a decision that disposes of the appeal one way or the other." *Bolling v. Farmers Branch Indep. Sch. Dist.*, 315 S.W.3d 893, 895 (Tex. App.—Dallas 2010, no pet.); *see also Roberts for Roberts v. City of Texas City*, No. 01-21-00064-CV, 2021 WL 5702464, at \*2 (Tex. App.—Houston Dec. 2, 2021, no pet.) (mem. op.) (appellate court may not "abandon[] its role as judge and assum[e] the role of advocate for a party").

Texas Rule of Appellate Procedure 38.1(i) requires that an appellant's brief "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). A failure to provide substantive analysis of an issue or cite appropriate authority waives a complaint on appeal. *Marin Real Estate Partners, L.P. v. Vogt*, 373 S.W.3d 57, 75 (Tex. App.—San Antonio 2011, no pet.); *Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.).

Jonathan's failure to address the third prong of *Craddock* in his brief means that he has not provided this Court with any appropriate argument, analysis,

22

discussion, or authority to explain why the trial court erred in concluding that the granting of his motion for new trial would have caused undue delay or otherwise injured Michelle. *See* TEX. R. APP. P. 38.1(i); *Richardson v. Marsack*, No. 05-18-00087-CV, 2018 WL 4474762, at \*1 (Tex. App.—Dallas Sept. 19, 2018, no pet.) (mem. op.) ("Our appellate rules have specific requirements for briefing," including requiring "appellants to state concisely their complaints, to provide succinct, clear, and accurate arguments for why their complaints have merit in law and fact, to cite legal authority that is applicable to their complaints, and to cite appropriate references in the record."); *Huey*, 200 S.W.3d at 854 ("We have no duty to brief appellant's issue for [him]. Failure to cite applicable authority or provide substantive analysis waives an issue on appeal."). When an appellant does not provide this Court with argument that is sufficient to make his appellate complaint viable, we will not perform an independent review of the record and the applicable law in order to determine whether any error complained of has occurred. *Maranatha Temple, Inc. v. Enter. Prods. Co.*, 893 S.W.2d 92, 106 (Tex. App.—Houston [1st Dist.] 1994, writ denied) ("We will not do the job of the advocate."); *see also Paselk v. Rabun*, 293 S.W.3d 600, 613 (Tex. App.—Texarkana 2009, pet. denied) ("It is not the proper role of th[e] [appellate court] to create arguments for an appellant—[the court] will not do the job of the advocate."); *Strange v. Cont'l Cas. Co.*, 126 S.W.3d

676, 678 (Tex. App.—Dallas 2004, pet. denied) (appellate court cannot remedy deficiencies in appellant's brief for him).

Accordingly, we hold that Jonathan has waived his complaint that the trial court erred in denying his motion for new trial due to inadequate briefing of the third prong of *Craddock*. *See, e.g.*, *Tex. Underground Utils., Inc. v. Sw. Bell Tel. Co.*, No. 01-19-00814-CV, 2021 WL 3356847, at *5–6 (Tex. App.—Houston [1st Dist.] Aug. 3, 2021, pet. denied) (mem. op.) (appellant waived complaint trial court erred in denying its motion for new trial after default judgment where appellant failed to adequately brief argument that it had satisfied second prong of *Craddock* because "it ha[d] a meritorious defense"); *Samara Portfolio Mgmt., LLC v. Zargari*, No. 13-17-00049-CV, 2018 WL 2979847, at *9 (Tex. App.—Corpus Christi–Edinburg June 14, 2018, pet. denied) (mem. op.) (although appellants asserted "that they [had] met the *Craddock* elements at the motion for new trial," appellants failed to adequately brief assertion that they had "a meritorious defense" and waived complaint trial court erred in denying their motion for new trial after post-answer default judgment (internal quotations omitted)); *Miller v. Torres*, No. 01-02-00436-CV, 2003 WL 1943336, at *1 (Tex. App.—Houston [1st Dist.] Apr. 24, 2003, no pet.) (mem. op.) (holding appellant waived complaint trial court erred in denying her motion for new trial after default judgment because appellant inadequately briefed "*Craddock* test").

## Conclusion

We affirm the judgment of the trial court.

Julie Countiss
Justice

Panel consists of Justices Goodman, Countiss, and Farris.